SUSAN JANE M. BROWN (OSB #054607)
WESTERN ENVIRONMENTAL LAW CENTER
4107 NE Couch St.
Portland, OR 97232
(503) 914-1323
brown@westernlaw.org

*Attorney for Plaintiffs*

### UNITED STATES DISTRICT COURT
### DISTRICT OF OREGON
### EUGENE DIVISION

| | |
|---|---|
| **CASCADIA WILDLANDS, KLAMATH-SISKIYOU WILDLANDS CENTER, AND OREGON WILD,** | Civ. Case No. |
| *Plaintiffs,* | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| vs. | Federal Land Policy and Management Act, 42 U.S.C. § 1701 *et seq.*; Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* |
| **BUREAU OF LAND MANAGEMENT** and **UNITED STATES DEPARTMENT OF the INTERIOR**, | |
| *Defendant.* | |

## INTRODUCTION

1.      Plaintiffs Cascadia Wildlands, Klamath-Siskiyou Wildlands Center, and Oregon Wild ("Plaintiffs") bring this action for declaratory and injunctive relief against federal Defendants Bureau of Land Management and United States Department of the Interior ("the BLM") for promulgating a final rule that: (1) violates the administrative review requirement of 42 U.S.C. § 1701(a)(5) of the Federal Land Policy and Management Act ("FLPMA") and (2) violates 5 U.S.C. § 706 and 5 U.S.C. § 553(c) of the Administrative Procedure Act ("APA").

2.      This action stems from the BLM's final rule, *Forest Management Decision Protest*

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 1 -

*Process and Timber Sale Administration*, 85 Fed. Reg. 82,359 (Dec. 18, 2020) ("Final

Administrative Protest Elimination Rule"), which Plaintiffs challenge on its face.

3.      Plaintiffs also incorporate an as-applied challenge to the Administrative Protest

Elimination Rule as relied on by the BLM to authorize the Mine your Manners Timber Sale

Decision Record ("Mine your Manners Timber Sale") without an administrative protest process.

4.      Should Plaintiffs prevail, Plaintiffs will seek an award of costs and attorneys' fees

pursuant to the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412.

## JURISDICTION AND VENUE

5.      This court has jurisdiction pursuant to 28 U.S.C. § 1331 (Federal Question) because this

action arises under the laws of the United States: 43 U.S.C. § 1701 *et seq.* (FLPMA) and 5

U.S.C. § 551 *et seq.* (APA).

6.      The relief sought is authorized by 28 U.S.C. § 2201 (Declaratory Judgment) and 28

U.S.C. § 2202 (Injunctive Relief).

7.      Venue is proper pursuant to 28 U.S.C. § 1391(e)(1)(B) because Defendant is a federal

agency of the United States government and a substantial part of BLM property that is affected

by the challenged Administrative Protest Elimination Rule is situated within this judicial district.

## INTRADISTRICT ASSIGNMENT

8.      This case is properly assigned to the Eugene Division under Civil L.R. 3-2 because the

challenged timber sale, Mine your Manners, is located in Lane County. Other BLM-managed

lands also affected by the Administrative Protest Elimination Rule, at issue in this dispute, are

also located within the Eugene Division. The BLM's violations of federal law have and will

continue to affect lands located within the Eugene Division.

9.      Additionally, Plaintiffs Cascadia Wildlands and Oregon Wild both have offices within

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 2 -

*Western Environmental Law Center*
*4107 NE Couch St.*
*Portland, OR 97232*
*(503) 914-1323*

the Eugene Division, and many individual members of each of the Plaintiff organizations are located within the Eugene Division.

## PARTIES

10.     Plaintiff CASCADIA WILDLANDS is a non-profit corporation headquartered in Eugene, Oregon, with approximately 12,000 members and supporters throughout the United States. Cascadia Wildlands educates, agitates, and inspires a movement to protect and restore wild ecosystems in the Cascadia Bioregion, extending from Northern California up into Alaska. Cascadia Wildlands envisions vast old-growth forests, rivers full of salmon, wolves howling in the backcountry, and vibrant communities sustained by the unique landscapes of the Cascadia Bioregion. Cascadia Wildlands' members and staff have used and will continue to use the Mine your Manners Timber Sale area for activities such as hiking, bird watching, camping, swimming, fishing, foraging, photography, and other recreational and professional pursuits. The interests of Cascadia Wildlands and its members will be irreparably harmed if the Mine your Manners Timber Sale is allowed to proceed without compliance with our federal environmental laws.

11.     Cascadia Wildlands has filed hundreds of administrative protests of federal timber sales and other projects over the past two decades of monitoring public lands' management in the Pacific Northwest. The organization has filed these protests on behalf of members and supporters fearful that the actions of the BLM failed to take into account or mitigate negative impacts to their communities, recreation opportunities, habitats, public safety, fire, drinking water, and imperiled species. The BLM has withdrawn decisions in response to Cascadia Wildlands' protests, revised NEPA documents in response to Cascadia Wildlands' protests, and substantively changed projects to address Cascadia Wildlands' concerns in response to the organization's protests.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 3 -

12.    Cascadia Wildlands engaged and commented during the BLM's rulemaking to eliminate the administrative protest process. The elimination of the administrative protest takes away Cascadia Wildlands' ability to advocate for its members and supporters through the administrative process. Frequently, issues are raised and addressed through these protests and ultimately resolved and/or further agency explanation in addressing and responding to administrative protests resolves many community concerns about impending projects. The elimination of the administrative protest moves administrative review from the BLM to federal district courts. The elimination of the administrative protest will and has increased the urgency with which these matters are brought before district courts, increasing the likelihood that temporary restraining orders and preliminary injunctions will need to be sought to prevent the logging of projects before their legality can be determined. The elimination of the administrative protest harms Cascadia Wildlands and its members and supporters by reducing their opportunities to improve federal land-management projects. The burden shift of this protest elimination further harms the organization by greatly increasing the expensive legal burden on Cascadia Wildlands and the communities it supports.

13.    Cascadia Wildlands provided timely comments on the Row River Timber Management Project Environmental Assessment ("Row River EA"), through which Mine your Manners was analyzed.

14.    Plaintiff KLAMATH-SISKIYOU WILDLANDS CENTER ("KS Wild") is a domestic nonprofit corporation organized and existing under the laws of the State of Oregon. KS Wild's primary office is in Ashland, Oregon. KS Wild has over 3,500 members and supporters in more than 10 states, with most members concentrated in southern Oregon and northern California. On behalf of its members, KS Wild advocates for the forests, wildlife, and waters of the Rogue and

*Western Environmental Law Center*
*4107 NE Couch St.*
*Portland, OR 97232*
*(503) 914-1323*

Klamath Basins and works to protect and restore the extraordinary biological diversity of the

Klamath- Siskiyou region of southwest Oregon and northwest California. KS Wild uses

environmental law, science, education, and collaboration to help build healthy ecosystems and

sustainable communities. Through its campaign work, KS Wild strives to protect the last wild

areas and vital biological diversity of the Klamath-Siskiyou region. KS Wild is a leader in

protecting Oregon's public lands and forests, and routinely participates in monitoring and

commenting on and challenging in court actions affecting public lands in Oregon. KS Wild is a

membership organization and has members who would be irreparably injured by the BLM's

elimination of the timber sale administrative protest process.

15.     For several decades, KS Wild and its members have utilized the administrative timber

sale protest process as a means of increasing the transparency and efficacy of BLM public lands

management. In particular, the BLM's timber sale protest process has afforded KS Wild and its

members with a meaningful opportunity to voice legal concerns to the agency and to potential

timber purchasers without needing to file litigation. This has been particularly important for

proposed BLM timber sales that contain "regeneration harvesting" in which fire hazard in treated

stands is increased for decades through the establishment of flammable, dense young timber

plantations.

16.     By eliminating the timber sale administrative protest process the BLM, and the automatic

stay of operations associated with a timber sale appeal the Interior Board of Land Use Appeals

(IBLA), the BLM has created a perverse incentive in which the only opportunity for KS Wild to

meaningfully object to illegal timber sale proposals that increase fire hazard is to file litigation in

federal court immediately after a project Decision Record is signed. The BLM's attempts to stifle

meaningful administrative review of its timber sale program will adversely impact KS Wild, its

*Western Environmental Law Center*
*4107 NE Couch St.*
*Portland, OR 97232*
*(503) 914-1323*

members, and the public.

17.     Plaintiff OREGON WILD is a charitable, non-profit corporation headquartered in Portland, Oregon with approximately 20,000 members and supporters who share our mission to protect and restore Oregon's wildlands, wildlife, and waters as an enduring legacy. Oregon Wild seeks to protect the state's remaining old-growth forests and roadless areas, and restore fully-functioning ecosystems and watersheds with a full complement of native species. For more than four decades, Oregon Wild staff and members have regularly participated in the NEPA process and submitted comments on timber sales and other management activities on federal public lands managed by the USDI Bureau of Land Management. In recent decades, Oregon Wild has availed itself of the BLM protest authority and filed well over 100 formal protests of BLM timber sales.

18.     The protest process has proved to be a useful way to engage with BLM managers to find mutually agreeable ways of resolving disputes surrounding BLM timber sales so that litigation can be avoided. For example, in August 2010, Oregon Wild resolved its protest of Salem BLM's Gordon Creek Thinning Project after BLM agreed to modify logging in some riparian reserves. In January 2016, Oregon Wild agreed to withdraw our protest of Salem BLM's ThunderKat and Bent Beekman timber sales after BLM agreed to defer logging in one stand (Unit 2) and modify logging prescription in a few adjacent areas (Unit 3) from clearcutting to thinning. In May 2011, Oregon Wild agreed to withdraw its protest after Salem BLM agreed to modify sample-tree falling practices. In other cases, the protest process helps narrow the issues surrounding BLM timber sales so that potential litigation is more focused and efficient. The challenged rule renders impossible the possibility of administratively resolving disputes such as these.

19.     Oregon Wild provided timely comments on the Row River EA, through which Mine your Manners was analyzed.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 6 -

*Western Environmental Law Center*
*4107 NE Couch St.*
*Portland, OR 97232*
*(503) 914-1323*

20.     Defendant BUREAU OF LAND MANAGEMENT ("the BLM") is a federal agency

within the Department of the Interior. The BLM is responsible for administering federal public

lands, including the Mine your Manners Timber Sale, Oregon & California Railroad Revested

Lands, and other public lands in the West, in accordance with FLPMA, the APA, and other

federal statutes.

21.     Defendant DEPARTMENT OF the INTERIOR is a cabinet-level federal agency that

contains and is responsible for overseeing the activities of the BLM.

## BACKGROUND

### The Administrative Procedure Act

22.     The APA is a federal statute that was enacted "to improve the administration of justice by

prescribing fair administrative procedure." Administrative Procedure Act, Pub. L. No. 79-404,

60 Stat. 237 (1946); 5 U.S.C. § 551 *et seq*.

23.     The APA requires that agencies "give interested persons an opportunity to participate in

[] rule making through submission of written data, views, or arguments with or without

opportunity for oral presentation. After consideration of the relevant matter presented,

the agency shall incorporate in the rules adopted a concise general statement of their basis and

purpose." 5 U.S.C. § 553(c).

24.     As part of that consideration, agencies "must consider and respond

to significant comments received during the period for public comment." *Perez v. Mortg.*

*Bankers Ass'n*, 575 U.S. 92, 96 (2015); *see* 5 U.S.C. § 553(c); *see also Idaho Farm Bureau Fed'n*

*v. Babbitt*, 58 F.3d 1392, 1404 (9th Cir. 1995); *American Mining Congress v. EPA,* 965 F.2d

759, 771 (9th Cir. 1992). Where an agency fails to respond to significant comments, the agency

rulemaking violates the APA. *See id.*; *see also United States v. Nova Scotia Food Prod. Corp.*,

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 7 -

*Western Environmental Law Center*
*4107 NE Couch St.*
*Portland, OR 97232*
*(503) 914-1323*

568 F.2d 240 (2d Cir.1977); *Portland Cement Ass'n v. Ruckelshaus*, 486 F.2d 375, 393–94 (D.C. Cir. 1973), cert. denied 417 U.S. 921, 94 S. Ct. 2628 (1974); *Nehemiah Corp. of Am. v. Jackson*, 546 F. Supp. 2d 830, 842 (E.D. Cal. 2008).

25.     Additionally, the APA provides for judicial review of final agency action. 5 U.S.C. § 704. Regarding when an action is considered final, § 704 states that "agency action otherwise final is final for the purposes of this section [regardless of any reconsideration], or, unless the agency otherwise requires by rule and provides that the action meanwhile is inoperative, for an appeal to superior agency authority." *Id.*

26.     In *Darby v. Cisneros*, the Supreme Court held that "where the APA applies, an appeal to superior agency authority is a prerequisite to judicial review only when expressly required by statute or when an agency rule requires appeal before review and the administrative action is made inoperative pending that review." 509 U.S. 137, 154 (1993). The Court stated that this ensures that "agencies may avoid the finality of an initial decision" only "by providing that the initial decision would be inoperative pending appeal. Otherwise, the initial decision becomes final and the aggrieved party is entitled to judicial review." *Id.* at 152.

27.     The APA provides that courts must "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

28.     The Supreme Court has held that an agency action is arbitrary, capricious, and not in accordance with law "if [an] agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicles*

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 8 -

*Mfrs v. State Farm*, 463 U.S. 29, 43 (1983). The Court also stated that an agency "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Id*.

29.     Further, under the APA, when an agency is not acting in an area for the first time, but instead changing its position on a particular issue on which it has conducted rulemaking in the past, the agency is "obligated to supply a reasoned analysis for the change." *State Farm*, 463 U.S. at 42; *see also Organized Vill. of Kake v. U.S. Dep't of Agriculture*, 795 F.3d 956, 968 (9th Cir. 2015) ("[E]ven when reversing a policy after an election, an agency may not simply discard prior factual findings without a reasoned explanation").

30.     In *FCC v. Fox Television Stations, Inc.*, the Supreme Court laid out four considerations that an agency must meet when it changes policy. 556 U.S. 502, 515-516 (2009). The agency must demonstrate that it: "(1) displays 'awareness that it is changing position,' (2) shows that 'the new policy is permissible under the statute,' (3) 'believes' the new policy is better, and (4) provides 'good reasons' for the new policy, which, if the 'new policy rests upon factual findings that contradict those which underlay its prior policy,' must include 'a reasoned explanation ... for disregarding facts and circumstances that underlay or were engendered by the prior policy'" or "when its prior policy has engendered serious reliance interests that must be taken into account." *Organized Vill. of Kake*, 795 F.3d at 966 (quoting *Fox Television Stations, Inc.*, 556 U.S. at 515-516).

### The BLM's Land Management Authorities

31.     The BLM is responsible for managing 245 million acres of public lands, approximately 12% of the landmass of the United States – more than any other government agency. *What We Manage*, BUREAU OF LAND MANAGEMENT, https://www.blm.gov/about/what-we-

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 9 -

*Western Environmental Law Center*
*4107 NE Couch St.*
*Portland, OR 97232*
*(503) 914-1323*

manage/national (last visited Apr. 29, 2021).

32.    The BLM primarily derives its authority from the Federal Land Policy and Management Act of 1976 ("FLPMA"), which directs the agency to manage public lands "on the basis of multiple use and sustained yield." 43 U.S.C. § 1701(a)(7).

33.    FLPMA mandates that the BLM manage public lands "in a manner that will protect the quality of scientific, scenic, historical, ecological, environmental, air and atmospheric, water resource, and archeological values; that, where appropriate, will preserve and protect certain public lands in their natural condition; that will provide food and habitat for fish and wildlife and domestic animals; and that will provide for outdoor recreation and human occupancy and use." 43 U.S.C. § 1701(a)(8).

34.    FLPMA states that the BLM is "required to establish comprehensive rules and regulations after considering the views of the general public; and to structure adjudication procedures to assure adequate third party participation, objective administrative review of initial decisions, and expeditious decisionmaking." 43 U.S.C. 1701(a)(5); *see Mountain State Legal Foundation v. Andrus* 499 F. Supp. 383, 395 (10th Cir. 1980) (stating that "[t]he language of Congress is mandatory" regarding the third party engagement requirements of § 1705(a)(5)).

35.    FLPMA also emphasizes the importance of public participation elsewhere in the statute, stating that the BLM shall establish procedures "to give the public adequate notice and an opportunity…to participate in the preparation and execution of plans and programs for, and the management of, the public lands." 43 U.S.C. § 1639(e).

36.    In 1971, the Interior Board of Land Appeals ("IBLA") was created by regulation. 43 C.F.R. § 4.1(b)(2). IBLA is an administrative appeals board of the Department of the Interior with administrative jurisdiction to render final decisions relating to public lands and their

resources. *Id.* IBLA's authority includes review of administrative appeals of decisions made by BLM officials.

37.    Included in the BLM's management authority are the Oregon and California Railroad Revested Lands ("O&C Lands"), placed under the agency's administration by the Oregon and California Revested Lands Sustained Yield Management Act of 1937. 43 U.S.C. § 2601 *et seq.*

38.    The O&C Lands are comprised of 2.4 million forested acres checkerboarded across western Oregon that contain a diversity of plant and animal species, recreation areas, grazing lands, cultural and historical resources, scenic areas, wild and scenic rivers, and wilderness. *O&C Lands*, BUREAU OF LAND MANAGEMENT, https://www.BLM.gov/programs/natural-resources/forests-and-woodlands/oc-lands (last visited Apr. 16, 2021). The O&C Lands are distinct in that they are one of the few forested lands managed by the BLM: federal forest management is more commonly carried out by the United States Forest Service on the national forests that encompass approximately 193 million acres of federal lands across the country.

**The National Environmental Policy Act**

39.    The National Environmental Policy Act of 1970 ("NEPA"), 42 U.S.C. § 4331 *et seq.*, was enacted by Congress to ensure that effects to human health and the environment were considered in all federal agency decisions. NEPA requires the preparation of an environmental impact statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C).

40.    The Council on Environmental Quality ("CEQ") is charged with promulgating NEPA regulations, which guide federal agencies in designing their own NEPA procedures. 40 C.F.R. § 1500 *et seq.* (2020).

41.    The BLM's NEPA procedures are described in its NEPA Handbook. BUREAU OF LAND

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 11 -

MANAGEMENT, NEPA HANDBOOK, H-1790-1 (2008).

42.     The CEQ's NEPA regulations allow an agency to prepare an environmental assessment

(EA) rather than an EIS "for a proposed action that is not likely to have significant effects or

when the significance of the effects is unknown unless the agency finds that a categorical

exclusion (§ 1501.4) is applicable or has decided to prepare an EIS." 40 C.F.R. § 1501.5 (2020).

43.     The CEQ's NEPA regulations only require an agency preparing an EA to "involve the

public… to the extent practicable." 40 C.F.R. § 1501.5(e) (2020).

44.     As noted in the BLM's NEPA Handbook, this means that "[t]he CEQ regulations do not

require agencies to make EAs available for public comment and review." NEPA HANDBOOK at

76. The BLM NEPA Handbook goes on to state that it is at "the discretion [of the decision-

maker] to determine how much and what kind of involvement works best for each individual

EA." *Id.*

45.     The CEQ's NEPA regulations allow an agency to create (and use) "categories of actions

that normally do not have a significant effect on the human environment, and therefore do not

require preparation of an environmental assessment or environmental impact statement." 40

C.F.R. § 1501.4 (2020). Once created, such an exception to the requirement to prepare an EIS or

EA is referred to as a categorical exclusion ("CX").

46.     Neither the CEQ's NEPA Regulations or the BLM's NEPA Handbook require or suggest

that the BLM provide for public comment or any other public involvement in the process of

preparing a CX.

47.     In 2020, CEQ revised its NEPA regulations. *Update to the Regulations Implementing the*

*Procedural Provisions of the National Environmental Policy Act; Final Rule*, 85 Fed. Reg.

43,304 (July 16, 2020) (to be codified at 40 C.F.R. Part 1500). CEQ's revised NEPA regulations

*Western Environmental Law Center*
*4107 NE Couch St.*
*Portland, OR 97232*
*(503) 914-1323*

state that "An agency may apply the regulations in this subchapter to ongoing activities and environmental documents begun before September 14, 2020." 40 C.F.R. § 1506.13. The Protest Rulemaking challenged in this action began before September 14, 2020. *Forest Management Decision Protest Process and Timber Sale Administration, Proposed Rule*, 85 Fed. Reg. 34,689 (June 8, 2020).

48.     On his first day of office, President Biden issued Executive Order 13990 (EO 13990): *Protecting Public Health and the Environment and Restoring Science to Tackle the Climate Crisis*. EO 13990 states that the policy of the Biden Administration is to, *inter alia*, utilize the best available science, improve public health, and protect our environment in federal decisionmaking. EO 13990 directs the heads of all agencies to review all existing regulations, orders, guidance documents, policies, and any similar agency actions promulgated, issued, or adopted between January 20, 2017, and January 20, 2021 that are inconsistent with the policy statement.

49.     The Biden Administration provided a non-exclusive list of agency actions that the heads of relevant agencies will review in accordance with EO 13990. CEQ has already taken steps to review and revise the 2020 CEQ NEPA regulations.

50.     In response to EO 13990, the Secretary of Interior issued Secretarial Order ("SO") No. 3399: *Department-Wide Approach to the Climate Crisis and Restoring Transparency and Integrity to the Decision-Making Process*. SO 3399 states that "Bureaus/Offices will not apply the 2020 Rule in a manner that would change the application or level of NEPA that would have been applied to a proposed action before the 2020 Rule went into effect on September 14, 2020."

**The Bureau of Land Management Timber Sale Process**

51.     The BLM timber sale decision process starts with analysis conducted by the BLM as

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 13 -

required under NEPA, the Council on Environmental Quality's NEPA implementing regulations, and the BLM's NEPA Handbook. 42 U.S.C. § 4321 *et seq.*; 40 C.F.R. § 1500 *et seq.*

52.     Typically, the BLM uses either a CX or an EA to document timber sales.

53.     Neither the CEQ NEPA Regulations nor the BLM's NEPA handbook require BLM to make a timber sale decision documented with an EA or a CX available for public comment prior to rendering a decision to authorize public timber for sale to private timber companies.

54.     If the BLM uses a CX or an EA with a Finding of No Significant Impact ("FONSI") for the timber sale decision, it issues a Decision Rationale ("DR") and subsequently publicly advertises the timber sale, usually through an announcement published in the local newspaper of record. *Instruction Memorandum No. OR-2008-084*, Attachment 1-1, UNITED STATES DEPARTMENT OF INTERIOR, BUREAU OF LAND MANAGEMENT (Aug. 25, 2008) [hereinafter *IM No. OR-2008-084*].

55.     In 1984, the BLM enacted a regulation after APA notice and comment rulemaking that provided for a 15-day administrative protest process for "forest management decisions, including advertised timber sales." *Forest Management Decisions; Administrative Remedies*, 49 Fed. Reg. 28,560 (July 13, 1984) ("1984 Administrative Protest Rule"); *see also* 43 C.F.R. § 5003.3 (superseded 2020).

56.     The 1984 Administrative Protest Rule's preamble states that the BLM undertook the rulemaking to "expedite implementation of decisions relating to forest management and provide the public with the opportunity to protest such decisions." 49 Fed. Reg. at 28,560.

57.     Under the 1984 Administrative Protest Rule, the 15-day period during which interested parties could file an administrative protest began the day after the timber sale was first advertised through a notice of sale in the local newspaper of record. 43 C.F.R. § 5003.2(a) (superseded

2020).

58.     If an administrative protest was filed during the 15-day period, the regulations required

the protestor to deliver a signed hardcopy of the protest to the BLM: the BLM did not accept

protests by fax or email.  *IM No. OR-2008-084* at Attachment 1-2, 1-3; *see* 43 C.F.R. § 5003.3(b)

(superseded 2020). BLM would then immediately forward a copy of the protest to the BLM

Oregon/Washington State Office Forest Management Advisor. *IM No. OR-2008-084* at 1-3.

59.     The BLM would next conduct a timber sale auction and disclose any administrative

protests to potential timber sale bidders before the auction began. *Id.* The highest bidder would

also be required to sign an acknowledgement of the existence of any administrative protests. *Id.*

60.     The BLM deciding officer would then consider the administrative protest and draft an

administrative protest decision either denying or granting the protest. *Id.* at 1-3; *see* 43 CFR §§

5003.3(d-e) (superseded 2020). If the BLM granted the administrative protest, the District could

then revise the project, the EA, and/or the decision. *IM No. OR-2008-084* at 1-4. If needed, the

District would reconsider the project and its supporting analysis and re-issue NEPA analysis

and/or the Decision Rational or FONSI as needed. *Id.*

61.     If the BLM denied the administrative protest, the denial triggered a 30-day administrative

appeal period, during which the protest filer could file a notice of administrative appeal with the

IBLA. 43 C.F.R. § 4.411(a). Administrative appellants could include a request for a stay of the

timber sale decision with the notice of administrative appeal filed with the IBLA. 43 C.F.R. §

4.21(b)(1).

62.     Meanwhile, if the BLM denied the administrative protest, an authorized BLM officer

could then decide to immediately proceed with implementation of the project decision. 43 C.F.R.

§ 5003.3(f) (superseded 2020). Prior to the Administrative Protest Elimination Rule challenged

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 15 -

in this litigation, when a decision to immediately proceed with implementation was made, this decision was referred to as a "full force and effect" decision. *IM No. OR-2008-084* at Attachment 1-5. Oregon/Washington BLM policy directed BLM Districts to wait to implement timber sale decisions until IBLA had reviewed both the request for stay and the BLM's response to the request. *Id.*

63.     However, BLM Districts could request that the State Director waive the policy against issuing full force and effect determinations until IBLA had reviewed the request for stay for specific timber sales. *Id.* Notably, in the years leading up to the elimination of the administrative protest process (2019 and 2020 in particular), the BLM had increasingly used this waiver to issue full force and effect decisions for protested timber sales instead of waiting for IBLA to have the opportunity to review any stay requests. *Instruction Memorandum No. OR-2019-008*, United States Department of Interior, Bureau of Land Management (May 7, 2019).

64.     If an appellant pursues an administrative appeal to IBLA, the appellant is required to file a statement of reasons with IBLA within 30 days of the notice of administrative appeal. 43 C.F.R. § 4.412(a). Within 10 days of the request for stay and within 30 days of the statement of reasons, the BLM must send its response to the IBLA. 43 C.F.R. §§ 4.21(b)(3), 4.414. IBLA then has 45 days from the close of the 30-day appeal period to rule on the stay request. 43 C.F.R. 4.21(b)(4).

65.     If IBLA grants the stay, the BLM will withhold award of the timber sale contract and will suspend the operation (i.e., logging) of any sale already awarded through the full force and effect authority. *IM No. OR-2008-084* at Attachment 13-1.

66.     If IBLA denies the stay, the District may award the timber sale contract and implementation of the timber sale can begin. *Id.*

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 16 -

67.     Then, in deciding the administrative appeal, IBLA may: affirm the BLM's administrative

protest decision, in which case the District can continue project implementation; or reverse the

BLM's administrative protest decision and remand the issue back to the District to be

reconsidered, in which case if a stay had not been issued, the District should suspend the sale if

awarded or continue to withhold the contract award. *Id.*

### The Elimination of the BLM Timber Sale Administrative Protest Process and the Challenged Rulemaking

68.     Plaintiffs, along with other interested parties, utilized the 15-day administrative protest

process on many occasions. While imperfect, the administrative protest process allowed

plaintiffs and interested parties an opportunity to voice concerns about BLM timber sales

through an administrative channel. The administrative process enabled interested parties to raise

issues with the sale of a BLM-managed, publicly-owned federal timber asset that, in some cases,

the BLM was then able to resolve. Those resolutions were achieved without litigation, saving the

BLM, the interested and taxpaying public, the federal judiciary, and timber purchasers both time

and money.

69.     Plaintiffs utilized the administrative protest process to compel changes to timber sale

decisions to address public concerns. In these cases, the BLM subsequently implemented timber

sales that were more ecologically appropriate and responded more concretely to public concerns.

70.     For example, in 2017, Plaintiffs Cascadia Wildlands and Oregon Wild filed a timely

protest of the Roseburg District BLM decision to implement the Woodchuck Timber Sale. After

successful communications between the BLM and Plaintiff Cascadia Wildlands regarding the

issues raised in the protest, the BLM agreed to modify the planned timber harvest area. In

resolution of the protest, thirty-one acres that had been designated for retention harvest were

*Western Environmental Law Center*
*4107 NE Couch St.*
*Portland, OR 97232*
*(503) 914-1323*

converted to commercial thinning. Cascadia Wildlands, Oregon Wild, the BLM, and the successful timber sale bidder all agreed to this modification and as a result, were able to avoid the time and cost of further administrative review and litigation.

71.    In 2015, Plaintiffs Cascadia Wildlands, KS Wild, and Oregon Wild filed a timely protest of the Down the Chute and Burnt Grizzly Timber Sales, which also included a Grazing Management Agreement. After a successful meeting among the local BLM field manager, agency staff, and a representative from KS Wild regarding the issues raised in the protest, the BLM agreed to modify the planned harvest and related grazing agreement. The BLM agreed that grazing would not resume in the allotment at issue for two years at a minimum and not until vegetation health and vigor had recovered to levels adequate to support and protect upland function, that grazing in burned areas would not resume in the allotment at issue for one year at a minimum and not until vegetation health and vigor had recovered to levels adequate to support and protect upland function, and that 40% of the high quality black-backed woodpecker habitat in the project area was reserved from harvest. All parties agreed to this modification and as a result were able to avoid the time and cost of further administrative review and litigation.

72.    Similarly, in 2014, Plaintiffs Cascadia Wildlands and Oregon Wild filed a timely protest of the C-9 and Rick-Line Timber Sales. After successful communications between the BLM and Plaintiffs Cascadia Wildlands and Oregon Wild regarding the issues raised in the protest, the BLM agreed to modify the planned timber harvest. The BLM eliminated a planned temporary road, eliminated four and a half acres of the timber harvest area, and dropped the entire riparian treatment area in one unit (approximately 5 acres). All parties agreed to this modification and as a result were able to avoid the time and cost of further administrative review and litigation.

73.    In 2013, Plaintiffs Cascadia Wildlands and Oregon Wild, along with Bark, another

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 18 -

interested organization, filed a timely protest of the Take 3 Timber Sale. After successful communications between the BLM and Plaintiffs Cascadia Wildlands and Oregon Wild regarding the issues raised in the protest, the BLM agreed to modify the planned timber harvest. The BLM eliminated approximately eight acres of the timber harvest area, including one acre of older forest, and eliminated plans for construction of a temporary road across private land. All parties agreed to this modification and as a result were able to avoid the time and cost of further administrative review and litigation.

74.     Additionally, in 2013 Plaintiffs Cascadia Wildlands, KS Wild, and Oregon Wild filed a timely protest of the East West Junction timber sale. BLM recognized that Plaintiffs raised valid issues regarding access to some units and granted some protest issues and denied others, which Plaintiffs appealed to the IBLA. After successful communications among the BLM, Plaintiffs, and the timber sale high bidder, the BLM agreed to modify the planned timber harvest. The BLM eliminated six units (comprising 49 acres) and .23 miles of associated road work; changed the harvest prescription for two units to retain four to five additional large trees and to add an additional 20 acres of fuels treatment; and prohibited operations in four units until the BLM conducted two years of northern spotted owl protocol surveys and determined that there was no occupancy within 1.3 miles of an owl site. All parties agreed to this modification and as a result were able to avoid the time and cost of further administrative review and litigation.

75.     In 2011, Plaintiffs Cascadia Wildlands, KS Wild, and Oregon Wild filed a timely protest of the Skeleton Mountain Timber Sale. The BLM denied the protest, and KS Wild subsequently appealed the decision to the IBLA. After successful communications among the BLM, Plaintiff KS Wild, and the timber sale high bidder, the BLM agreed to modify the planned timber harvest. The BLM eliminated 15 acres and 146,000 board feet of timber to retain older forest stands and

*Western Environmental Law Center*
*4107 NE Couch St.*
*Portland, OR 97232*
*(503) 914-1323*

replaced the volume by adding acres from mid-age class stands. Additionally, in tractor logging units on sensitive soils, the logging system was changed from tractor to loader or shovel logging, and the BLM and the purchaser agreed to work with the operator to reduce the amount of new temporary road construction. Finally, the BLM agreed to continue to implement other proposed actions in the EA, including 2.5 miles of road decommissioning and 2 miles of stream restoration work. All parties agreed to this modification and as a result were able to avoid the time and cost of further administrative review and litigation.

76.    At the resolution of the Skeleton Mountain Timber Sale protest process, the BLM Field Manager thanked Plaintiffs for their efforts in resolving the issues "in a very positive and productive manner" and stated that she "continue[d] to look forward to working with [Plaintiffs] on these, and other important forest management issues in Southwest Oregon." Letter from Jen K. Raby, BLM Field Manager, Butte Falls Resource Area, to George Sexton, Klamath Siskiyou Wildlands Center and John Murphy, President, Murphy Company (June 14, 2012) (on file with Plaintiff KS Wild).

77.    In 2010, Plaintiffs Cascadia Wildlands, KS Wild, and Oregon Wild filed a timely protest of the Swinning Timber Sale. After successful communications between the BLM and Plaintiffs regarding the issues raised in the protest the BLM agreed to modify the planned timber harvest. The BLM agreed to remove 26 large diameter trees from the timber sale contract; the trees were mutually identified by KS Wild, Murphy Co. (the timber sale purchaser), and the BLM during a site visit. All parties agreed that replacement trees would be determined during a joint site visit by the same three parties, with an agreement that the bulk of replacement trees would be white fir within a 16-24 inch diameter range. Additionally, the BLM agreed to make an effort to ensure that replacement trees would be identified using an ecological rationale, like fire resiliency or

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 20 -

*Western Environmental Law Center*
*4107 NE Couch St.*
*Portland, OR 97232*
*(503) 914-1323*

pine retention. All parties agreed to this modification and as a result were able to avoid the time and cost of further administrative review and litigation.

78.     The foregoing examples of successful administrative resolution of public concerns regarding BLM's management of public forestlands demonstrate the value of the administrative protest process to increasing administrative efficiency, increasing the likelihood of project implementation, decreasing controversy, and decreasing the use of judicial review to resolve disputes.

79.     On June 8, 2020, the BLM published a notice of proposed rulemaking to the Federal Register and announced its intent to eliminate the 15-day administrative protest process that had been in place for 36 years. *Forest Management Decision Protest Process and Timber Sale Administration*, 85 Fed. Reg. 34,689 (June 8, 2020) ("proposed rule").

80.     In addition to eliminating the administrative protest period, the proposed rulemaking sought "public comment on whether the BLM should have discretion to issue all or some forest management decisions in full force and effect." *Id.* at 34,691. Issuing timber sale decisions in full force and effect means that there would be no automatic pause of timber sale implementation while IBLA considered any requests for stay. The proposed rule purported to remove the administrative protest process for full force and effect decisions, and effectively removed any meaningful IBLA administrative appeals process because it permitted BLM to proceed with a timber sale and subsequent timber harvest while the IBLA considers an administrative appeal of the timber sale. 43 C.F.R. § 5003.1 (2021).

81.     In response to the proposed rule, Plaintiffs provided public comments that laid out a multitude of reasons that the BLM should retain the 15-day administrative protest process.

82.     For example, plaintiffs explained that the ability of BLM officers to issue timber sales as

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 21 -

full force and effect decisions, which do not have an automatic stay when administratively appealed to the IBLA, would mean that there was no longer *any* meaningful administrative review of full force and effect timber sale decisions prior to trees being logged, in violation of FLPMA's mandatory administrative review requirement. *Letter from Western Environmental Law Center on Behalf of Conservation Organizations to Secretary David Bernhardt and Acting Director William Pendley* (Aug. 6, 2020) [hereinafter Plaintiffs' Comment Letter].

83.    While the option to appeal to the IBLA still technically exists for full force and effect decisions, the lack of an automatic stay means that the BLM can still proceed with the timber sale and allow timber harvest to occur while the IBLA considers the administrative appeal, which creates a disincentive to negotiate for mutually satisfactory outcomes. For Plaintiffs and other interested parties who used the administrative protest process to work with the BLM to reduce harmful effects of timber sale decisions, this renders the administrative appeal meaningless, in addition to conflicting with the requirements of FLPMA. 43 U.S.C. 1701(a)(5).

84.    Plaintiffs' Comment Letter raised the need for the BLM to address the exhaustion of administrative remedies issue, specifically asking the agency to address whether an appeal to IBLA would be required for parties to exhaust their administrative remedies after the 15-day administrative protest process was eliminated, prior to seeking judicial review of a timber sale decision. Plaintiffs' Comment Letter at 5.

85.    Plaintiffs further explained how the elimination of the administrative review of timber sale decisions would lead to increased controversy and federal litigation, requiring additional expenditures of all parties' resources, including the BLM and the judiciary. *Id.*

86.    Moreover, plaintiffs explained that rational administrative review processes that are strong, fair, open, inclusive, and transparent have high democratic and social value because they

*Western Environmental Law Center*
*4107 NE Couch St.*
*Portland, OR 97232*
*(503) 914-1323*

lead to predictability, efficiency, and acceptability, and are fundamental to a strong and functioning democracy. *Id.* at 6.

87.     Plaintiffs urged the BLM to adopt a timber sale pre-decisional administrative review process akin to the Forest Service's procedures, 36 C.F.R. Part 218, which is more collaborative and responsive, resulting in "a more stable, less controversial and less litigated timber program." Plaintiffs Comment Letter at 10.

88.     Plaintiffs also highlighted that the proposed rule was unclear regarding the scope of its application and as such was fatally vague. *Id.* at 18. Plaintiffs explained that the proposed rule did not make it clear whether the 462,000 acres of O&C Lands managed by the Forest Service under the Controverted Lands Act would fall under the scope of the final rule. Act of June 24, 1954, ch. 357, § 1(a), 68 Stat. 270, 270-71.

89.     Plaintiffs questioned the BLM's partial justification for the proposed rule that the rule would reduce wildfire risk. The preamble to the proposed rule blamed delays caused by "prolonged decision making processes," for "[delaying] the implementation of critical wildfire mitigation treatments." *Forest Management Decision Protest Process and Timber Sale Administration*, 85 Fed. Reg. at 34,691. However, because the majority of timber sales prepared under the BLM's 2016 Resource Management Plan include regeneration harvest, where "mature fire-resilient forests are logged and replaced with dense young timber plantations that increase fire hazard for several decades," harvesting those forests actually leads to an *increased* fire risk. Plaintiffs' Comment Letter at 13. Plaintiffs thus contended that the proposed rule would increase, not decrease, wildfire risk, undermining the BLM's partial justification for the rule.

90.     Plaintiffs specifically requested that if the BLM proposed the elimination of the protest process out of a concern for fire hazards that the BLM consider a rule that retained

*Western Environmental Law Center*
*4107 NE Couch St.*
*Portland, OR 97232*
*(503) 914-1323*

administrative protests for logging practices (regeneration harvest logging) that increase fire hazard for decades. *Id.* at 14.

91.     Plaintiffs urged the BLM to not alter the definition of "forest management activity" because it would "ensure that widely supported BLM forest management activities such as plantation thinning and the utilization of prescribed fire will be wrapped into controversial timber sale decision documents that authorize regeneration logging, removal of critical habitat for listed species, and new logging road construction." *Id.* at 19.

92.     United States Senators for the State of Oregon (the state in which the BLM O&C Lands at issue are located), Ron Wyden and Jeff Merkley, also wrote the BLM in response to the proposed rule, expressing "grave concern" with the elimination of the 15-day administrative protest process and asking the BLM to reconsider its proposed rulemaking. *Letter from Senators Ron Wyden and Jeffrey A. Merkley to Secretary David Bernhardt and Acting Director William Pendley* (Aug. 5, 2020) [hereinafter Senators' Comment Letter].

93.     The Senators' Comment Letter expressed similar concerns to Plaintiffs' Comment Letter, including comments stating that: (1) the Senators had "found that diverse stakeholders working together in collaboration are more likely to craft creative, durable solutions to management challenges" and that "ensuring that members of the public are heard, and have an opportunity to challenge an agency decision, is a cornerstone of American democracy and effective land management;" (2) "[w]hile the BLM's current administrative process is not perfect, the Proposed Rule is in the best interest of neither Oregonians nor the agency;" (3) the Forest Service's predecisional administrative review procedures was a successful alternative that the BLM should consider if it wanted to change its administrative review processes; and (4) the Senators were concerned about increased litigation if the public "could not resolve its concerns

*Western Environmental Law Center*
*4107 NE Couch St.*
*Portland, OR 97232*
*(503) 914-1323*

administratively," leading to increased chances that the BLM would be unable to deliver a sustainable supply of timber from O&C Lands and thus compounding "the economic crisis that has followed the COVID-19 global pandemic." *Id.*

94.    On December 18, 2020, the BLM published the Administrative Protest Elimination Final Rule in the Federal Register. The Administrative Protest Elimination Rule eliminated the 15-day administrative protest process and replaced it with nothing. The Administrative Protest Elimination Rule went into effect on January 19, 2021.

**The BLM Failed to Respond to Substantive Public Comments**

95.    The BLM failed to respond to significant issues raised in Plaintiffs' and the Senators' Comment Letters, as required by the APA and subsequent caselaw. *See* 5 U.S.C. § 553(c); *Perez*, 575 U.S. at 96; *see also Idaho Farm Bureau Fed'n*, 58 F.3d at 1404; *American Mining Congress,* 965 F.2d at 771.

96.    The BLM failed to respond to the following public comments submitted by Plaintiffs and others: (1) a request for the BLM to address whether an appeal to IBLA would be required for parties to exhaust their administrative remedies after the 15-day administrative protest process was eliminated prior to seeking judicial review; (2) public comments that "rendering the IBLA process illusory is [ ] arbitrary, capricious, and not in accordance with the APA"; (3) public comments regarding the public policy benefits of having a strong, fair, open, inclusive, and transparent administrative review process; (4) public comments regarding the veracity of the BLM's purported link between the administrative protest process and an increase in wildfire risk; (5) public comments that the proposed rule was fatally vague; (6) public comments requesting that the BLM to disclose whether the rule only applies to O&C Lands managed by the BLM or if it also applies to the Controverted Lands managed by the Forest Service; (7) public comments

*Western Environmental Law Center*
*4107 NE Couch St.*
*Portland, OR 97232*
*(503) 914-1323*

regarding why the definition of "forest management activity" should not be altered; and (8) public comments suggesting that the Forest Service's administrative review processes could better serve the BLM's goals of decreasing controversy and litigation.

97.     While the BLM did acknowledge Plaintiffs' comments that the Administrative Protest Elimination Rule would render the administrative review process meaningless and lead to increased litigation, the BLM's response was inadequate. Instead of providing a substantive response, the BLM stated that administrative appeal to IBLA is still available (albeit without an automatic stay) and that "parties can continue to challenge forest management decisions in Federal court." *Forest Management Decision Protest Process and Timber Sale Administration*, 85 Fed. Reg. 82,361 (Dec. 18, 2020) ("Final Rule" or "Administrative Protest Elimination Rule"). This response did not acknowledge the issue raised in Plaintiffs' Comment Letter: that eliminating the administrative protest process would leave all parties worse off, including the BLM, leading to increased controversy and litigation and expenditures of resources by all parties.

98.     Challenging the BLM's decisions in federal court will indeed continue to be a possibility for members of the public who are dissatisfied with BLM's resolution of their concerns with a proposed timber sale – which is exactly what will cause increased controversy and litigation. The administrative protest process served to alert the BLM to potential legal defects in a timber sale prior to auction, giving the agency an opportunity to remedy those defects. Without the protest process, the BLM will be left guessing whether a timber sale will be challenged in court until a lawsuit is filed. BLM's response to Plaintiffs' comment was circular and inadequate.

99.     Similarly, BLM's response to Plaintiffs' public comment urging the agency to adopt a timber sale administrative review process similar to the Forest Service's process was inadequate.

*Western Environmental Law Center*
*4107 NE Couch St.*
*Portland, OR 97232*
*(503) 914-1323*

The BLM simply stated, without evidence, that it "has determined [ ] that public participation can otherwise be integrated into the BLM's decision-making process, including into the project-specific NEPA process for most forest management decisions, and that an additional comment period would be redundant and unlikely to raise new issues or lead to different outcomes."

100.    The BLM's assertion that NEPA processes would be a surrogate for the administrative protest process is inaccurate because most BLM timber sales are documented with a CX or an EA. CEQ's 2020 NEPA regulations do not require public comment on CXs and EAs, effectively meaning no public comment will be available for projects documented with those two tools. *See* 40 C.F.R. § 1501.5 (2020). NEPA analysis – which focuses on predicting the environmental consequences of a federal action – is not a substitute for administrative review.

101.    Additionally, the BLM entirely failed to address Plaintiffs' public comment explaining why eliminating the administrative protest process will not serve the rulemaking's stated purpose of reducing wildfire risk. As Plaintiffs noted, the vast majority of timber sales prepared under the BLM's 2016 Regional Management Plan include "regeneration harvest" logging prescriptions in the Harvest Land Base, where mature fire-resilient forests are logged and replaced with dense timber plantations that increase fire hazard for several decades. It is not the administrative review process that increases fire risk but decades of BLM fire suppression and exclusion and the BLM's regeneration silvicultural prescriptions, as the BLM itself has concluded in NEPA analyses of its proposed timber harvests. As noted in Plaintiffs' public comments, if the intent of the administrative protest process elimination rulemaking was to expedite both fuels reduction and timber sale activities, then the BLM would be best served in adopting mechanisms to allow for project planning outcomes that reduce, rather than increase, fire hazard in treated stands and that free timber planners from the BM's self-inflicted mandate to conduct regeneration logging

*Western Environmental Law Center*
*4107 NE Couch St.*
*Portland, OR 97232*
*(503) 914-1323*

regardless of the resulting increase in fire hazard in treated stands. These comments were not addressed in the final rulemaking.

**The BLM Did Not Supply a Reasoned Analysis for Its Change in Policy Position**

102.    The 15-day administrative protest process created by the BLM in 1984 was promulgated to "expedite implementation of decisions relating to forest management and provide the public with the opportunity to protest such decisions." The BLM's decision in 2020 to eliminate the administrative protest process and replace it with nothing was an unpermitted change in agency policy position.

103.    The BLM's rulemaking was arbitrary, capricious, and not in accordance with law because it did not meet the requirements established by the Supreme Court that must be met when an agency changes its policy position. *See* 5 U.S.C. 706(2)(A); *see also State Farm*, 463 U.S. at 43; *Organized Vill. of Kake*, 795 F.3d at 968; *Fox Television Stations, Inc.*, 556 U.S. at 515-516.

104.    The BLM has not met the first *Fox* factor because it has not demonstrated full awareness of its change in position. In the Preamble of the Administrative Protest Elimination Rule, the BLM cherry-picks quotes from the Preamble of the 1984 Administrative Protest Rule, stating that the implementation of the 15-day public protest process was a measure that "was originally proposed to 'expedite implementation of decisions relating to timber management.'" *Forest Management Decisions; Administrative Remedies*, 49 Fed. Reg. at 28,560. The BLM conveniently leaves out the second part of that quote, which states "...and provide the public with the opportunity to protest such decisions." *Id.*

105.    In justifying the Final Administrative Protest Elimination Rule, the BLM states that "this rule removes an administratively burdensome process that has been found to not meet its original intent to expedite timber management decisions." *Forest Management Decision Protest Process*

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 28 -

*Western Environmental Law Center*
*4107 NE Couch St.*
*Portland, OR 97232*
*(503) 914-1323*

*and Timber Sale Administration*, 85 Fed. Reg. at 82,362. This explanation attempts to obscure the original purpose of the administrative protest process, which was to provide the public with an opportunity to administratively protest timber sale decisions.

106.    Because the Final Administrative Protest Elimination Rule eliminates the administrative protest process provided by the 1984 Administrative Protest Rule, and because the BLM failed to publicly disclose and acknowledge that this administrative review process was a major purpose of the 1984 Administrative Protest Rule, the BLM has failed to demonstrate awareness that it was changing position in violation of the APA.

107.    The BLM has not met the second *Fox* factor because it has not demonstrated that the new policy is permissible under the applicable statute. Elimination of the administrative protest process, along with a lack of automatic stay for full force and effect timber sale decisions, results in a lack of meaningful administrative review for timber sale projects. Such a policy is not permissible under FLPMA because it violates the statute's command that the BLM provide the public with "objective administrative review of initial [BLM] decisions" and to give the public "an opportunity...to participate in the...execution of plans and programs for, and the management of, the public lands." 43 U.S.C. §§ 1701(a)(5), 1639(e).

108.    The BLM has not met the third *Fox* factor because it has not shown that it believes that the Final Administrative Protest Elimination Rule is "better" than the prior policy. The BLM received significant public comments that the Administrative Protest Elimination Rule was *not* a better policy than the status quo. However, the BLM failed to address those significant comments and simply re-asserted, without support in the record, that NEPA processes provided better public participation opportunities, a factually untrue statement, and that the protest process was redundant and inefficient, statements also not supported by the BLM's own data. The BLM

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 29 -

did not address public comments, including those from Plaintiff organizations, regarding why the elimination of the administrative protest process: was a poor policy decision; would lead to subpar ecological results for many reasons including increased controversy and costs; would increase the risk of wildfire; and would implicate issues with the lack of transparent, collaborative administrative processes that are recognized as highly valuable to a functioning democracy, including democratic processes pertaining to the management of public lands.

109.    Under the final *Fox* factor, which requires that the BLM provide good reasons for the change in position and to take into account any reliance interests on the previous regulation, the BLM has also failed to make the requisite showing. The Supreme Court has explained that an agency must provide "a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *State Farm,* 463 U.S. at 43 (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). In the Final Administrative Protest Elimination Rule, the BLM stated that while the administrative protest process has remained the same since 1984, the BLM's forest management planning and environmental review has changed, providing the public an opportunity to "participate…during the decision-making process when their input is most helpful." 85 Fed. Reg. at 82,360.

110.    Again referring to the "expedit[ing] implementation of decisions" quote from the 1984 Administrative Protest Rule preamble, the BLM states that "in some cases today individuals and organizations that are not satisfied with the final forest management decision are using the protest process to delay implementation…." *Id.* The agency then states that "responding to these protests can be costly" and "in many cases may not improve the agency decision or reduce appeals and litigation." *Id*. The BLM provides no data to support these assertions, and runs directly counter to the experience of Plaintiffs.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 30 -

111.    Indeed, the BLM's Regulatory Impact Analysis prepared in support of the Administrative Protest Elimination Rule shows that from 2002 to 2017, only 11% of the agency's timber sale decisions were protested – roughly one administrative protest per month over a 15-year period. Bureau of Land Management, *Economic and Threshold Analysis For Proposed Forest Management Rule* (Feb. 3, 2020), *available at* https://www.regulations.gov/document?D=BLM-2020-0002-0002.

112.    Observing that "responding to…protests can be costly" states the obvious: any amount of administrative review or public involvement will involve costs to the federal agency. But FLPMA requires administrative review of BLM decisions, and stating the protest process "can be costly" is not a reasonable basis to eliminate statutory public procedures pertaining to the management of public lands.

113.    The BLM's own data shows that a relatively low number of timber sales are protested: less than one per month. The BLM does not provide any information regarding what number of administrative protests would be "appropriate" or "acceptable," or the data that would support such a determination.

114.    Moreover, Plaintiffs provided public comment that eliminating the administrative protest process will in fact be more costly to the BLM due to the increased controversy and associated litigation. Increased costs will accrue to the BLM and the public because the only avenue available to the public, and to Plaintiffs, to resolve disputes will be to resort to the federal court system, thus accomplishing the opposite of the BLM's stated goal of reducing litigation it proffered during the rulemaking process. The Regulatory Impact Analysis thus does not support the BLM's conclusion that the administrative protest process "can be" costly, much less that it is in fact costly.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 31 -

*Western Environmental Law Center*
*4107 NE Couch St.*
*Portland, OR 97232*
*(503) 914-1323*

115.   Nor does the Regulatory Impact Analysis support the BLM's contention that the administrative protest process "may not improve" the BLM's decisionmaking process or reduce administrative appeals and litigation; and indeed, Plaintiffs' experience with the process is to the contrary: administrative protests in fact aid the BLM in resolving public comments and concerns without administrative appeal to the IBLA or legal appeal to the courts. Without an administrative protest process, in addition to the agency's ability to implement the timber sale decision immediately, members of the public who have concerns about a proposed timber sale have no required administrative remedies to exhaust, and in fact will be left with no option other than to file a lawsuit in federal court – which will certainly not lead to reduced administrative appeals or litigation. The BLM's justification for the Administrative Protest Elimination Rule fails to demonstrate a "rational connection" between the facts found and the decision made.

116.   BLM's rationale that the environmental review procedures required by NEPA will adequately protect the public's – and Plaintiffs' – *administrative review rights* rests on a false premise. As discussed *supra*, the BLM regularly documents timber sale decisions with either a CX or an EA, rather than an EIS. However, the 2020 CEQ NEPA regulations exempt decisions analyzed with a CX or EA from public comment, 40 C.F.R. § 1501.5 (2020), and precludes federal agencies from adopting or implementing procedures beyond those authorized by CEQ (i.e., a public comment period on a timber sale decision documented with a CX or EA), 40 C.F.R. § 1507.3. Therefore, the BLM cannot rely on "the NEPA process" to provide public comment opportunities on the vast majority of BLM timber sale decisions, which are documented with either an EA or CX.

117.   Moreover, the NEPA process pertains to analysis of *proposed* federal agency actions and forecasting the environmental consequences of those actions, not administrative review of *final*

agency decisions. Relying on NEPA's environmental consequence forecasting does not and cannot provide the public with administrative review of final agency actions.

118.    Finally, the BLM failed to take into consideration the reliance interests of Plaintiffs' members when it changed its position. The Supreme Court, in both *Fox* and more recently *Department of Homeland Security v. Regents of the University of California,* recognized that an agency must take reliance considerations created by the former regulation into account when changing a policy position. 140 S.Ct. 1891, 1913-14 (2020).

119.    Plaintiffs, all of which have members who live and recreate in and near areas directly affected by BLM timber sale decisions, have developed reliance interests on the administrative protest process under the former rule. Plaintiffs have devoted significant time and resources, both on individual member- and organizational-levels, to learning and navigating the administrative protest process as a means of working with the BLM to modify or make important changes to timber sale decisions. Plaintiffs relied on the administrative protest process to protect their interests from timber sale decisions that degrade water quality; increase fire hazards near their homes and communities; increase risks of flooding, landslides, and drought; increase climate extremes; reduce property value; reduce the local recreation and tourism economy that depends on the availability of wild places and high quality recreational opportunities; lead to loss of quality of life and loss of functioning ecosystem processes; and open up federal public lands adjacent to members' homes to trespassers and off road vehicles, among other detriments.

120.    These concerns are particularly relevant given the checkerboard nature of the O&C lands in western Oregon, which are intermingled with private industrial forestlands and small privately-held lands not managed for timber production: in this scenario, there is an increased likelihood of land management conflicts between industrial and non-industrial lands. Plaintiffs

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 33 -

*Western Environmental Law Center*
*4107 NE Couch St.*
*Portland, OR 97232*
*(503) 914-1323*

relied on the administrative protest process to mitigate some of the difficulties that arose from the O&C lands checkerboard, as Plaintiffs knew they were at least able to use the protest process to address land management concerns regarding BLM-managed lands, even if other industrial landowners were not required to listen to their concerns.

121.    Additionally, in reliance on the administrative protest process, Plaintiffs hired and trained employees and volunteers, including community education and outreach specialists, to navigate the administrative protest process as a viable method of administratively working through the issues of problematic timber sales with the BLM. Plaintiffs and their individual members also invested in their homes and communities in reliance on the administrative protest process continuing to offer them a means to work with the BLM to ensure the harms listed above would continue to be mitigated without legal action. Those reliance interests were not considered by the agency in promulgating the Administrative Protest Elimination Rule.

**The Administrative Protest Elimination Rule Violates
FLPMA's Administrative Review Requirement**

122.    The BLM's elimination of the administrative protest process and the lack of automatic stay for a full force and effect timber sale decision renders BLM timber sale decisions "final agency action" under 5 U.S.C. § 704. *Darby*, 509 U.S. at 154.

123.    As a result, under *Darby*, there is no prerequisite to judicial review for full force and effect timber sale decisions because the decision remains operative pending administrative appeal to IBLA. 509 U.S. at 154.

124.    Eliminating the administrative protest process, in combination with the lack of automatic stay, renders the administrative appeal process illusory and is in direct violation of FLPMA's requirement for administrative review of agency decisions. 43 U.S.C. § 1701(a)(5).

*Western Environmental Law Center*
*4107 NE Couch St.*
*Portland, OR 97232*
*(503) 914-1323*

**Mine your Manners Timber Sale Decision Record**

125.    On August 13, 2018, the BLM issued an Environmental Assessment for the Row River

Timber Management Project ("Row River EA"). On September 25, 2018, the BLM issued a

Finding of No Significant Impact for the Row River EA.

126.    On September 27, 2021, the BLM issued a decision document for the Mine your Manners

Timber Sale, as described and analyzed under the Row River EA.

127.    The Mine your Manners Timber Sale will involve 131 acres of regeneration harvest.

Between 5 and 15 percent of the pre-harvest stand basal area in live trees will be retained in each

harvest unit and the remaining timber within the unit would be commercially harvested. As

described in the Row River EA, Mine your Manners Timber Sale involves .52 miles of proposed

road construction and 12.86 miles of proposed road renovation.

128.    The Mine your Manners Timber Sale is located southeast of Cottage Grove, Oregon,

within the Row River 5th field watershed in Lane County, on BLM land intermixed with private,

state, and county lands.

129.    Plaintiffs' Comment Letter alerted the BLM that the Administrative Protest Elimination

Rule is facially invalid, in violation of the APA and FLPMA. As a result, the BLM was on notice

that authorizing a timber sale (Mine your Manners) without an administrative protest process

would violate both statutes.

130.    The Administrative Protest Elimination Rule became effective on January 19, 2021 and

the BLM signed the Mine your Manners Timber Sale Decision Record on September 27, 2021.

Consequently, the BLM is proceeding with the timber sale contracting process without providing

any opportunity for the public to administratively protest the Project.

131.    The BLM authorized the Mine your Manners Timber Sale as a full force and effect

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 35 -

*Western Environmental Law Center*
*4107 NE Couch St.*
*Portland, OR 97232*
*(503) 914-1323*

decision, without any automatic pause of timber sale implementation while IBLA considered any requests for a stay. Consequently, Mine your Manners Timber Sale is proceeding without any meaningful administrative appeals process because the BLM may proceed with the Mine your Manners Timber Sale and subsequent timber harvest while the IBLA considers administrative appeals.

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Violation of the Administrative Procedure Act (5 U.S.C. § 706(2)):**
**Failure to Explain Agency Change in Position**

132.   Plaintiffs incorporate by reference all preceding paragraphs.

133.   Under the APA, an agency is required to supply a reasoned analysis for a change in position, without which an agency action is arbitrary, capricious, and not in accordance with law. 5 U.S.C. § 706(2).

134.   The agency must demonstrate that it: "(1) displays 'awareness that it is changing position,' (2) shows that 'the new policy is permissible under the statute,' (3) 'believes' the new policy is better, and (4) provides 'good reasons' for the new policy, which, if the 'new policy rests upon factual findings that contradict those which underlay its prior policy,' must include 'a reasoned explanation ... for disregarding facts and circumstances that underlay or were engendered by the prior policy'" or "when its prior policy has engendered serious reliance interests that must be taken into account." *Organized Vill. of Kake*, 795 F.3d at 966 (quoting *Fox Television Stations, Inc.*, 556 U.S. at 515-516).

135.   The BLM has failed to demonstrate any of the four requirements needed to provide a reasoned analysis to support its change in position. The BLM also failed to consider Plaintiffs' reliance interests when proposing and finalizing the Administrative Protest Elimination Rule.

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 36 -

*Western Environmental Law Center*
*4107 NE Couch St.*
*Portland, OR 97232*
*(503) 914-1323*

136.    Because the BLM failed to show a rational basis for its change in position, the Administrative Protest Elimination Rule violates the APA and is facially invalid.

137.    Plaintiffs are entitled to their reasonable fees, costs, and expenses associated with this litigation pursuant to the EAJA. 28 U.S.C. § 2412.

**SECOND CLAIM FOR RELIEF**
**Violation of the Administrative Procedure Act (5 U.S.C. § 553(c)):**
**Failure to Respond to Significant Public Comments During Rulemaking Process**

138.    Plaintiffs incorporate by reference all preceding paragraphs.

139.    Under the APA, an agency undertaking a notice-and-comment rulemaking is required to consider "relevant matter" received during the period for public comment and respond with a "concise general statement." 5 U.S.C. § 553(c).

140.    As part of that obligation, agencies "must consider and respond to significant comments received during the period for public comment." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. at 96; *see also Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d at 1404; *American Mining Congress v. EPA,* 965 F.2d at 771.

141.    Here, Plaintiffs engaged in the rulemaking process and provided significant comments about the proposed rule, including pointing out the numerous problems with eliminating the protest process and why doing so would not help the BLM further its stated goals.

142.    The BLM did not consider or respond to numerous significant and substantive comments by Plaintiffs.

143.    Because the BLM failed to respond to significant comments during the rulemaking process, the Administrative Protest Elimination Rule violates the APA and is facially invalid.

144.    Plaintiffs are entitled to their reasonable fees, costs, and expenses associated with this

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 37 -

*Western Environmental Law Center*
*4107 NE Couch St.*
*Portland, OR 97232*
*(503) 914-1323*

litigation pursuant to the EAJA. 28 U.S.C. § 2412.

## THIRD CLAIM FOR RELIEF
**Violation of the Federal Land Policy and Management Act (43 U.S.C. § 1701(a)(5)):
Failure to Provide Adequate Administrative Review of Initial Timber Sale Decisions**

145.    Plaintiffs incorporate by reference all preceding paragraphs.

146.    BLM cannot promulgate regulations that are manifestly contrary – or *ultra vires* – to the text and purpose of FLPMA.

147.    The Administrative Protest Elimination Rule is *ultra vires* and contrary to law because it is contrary to the plain language of FLPMA.

148.    FLPMA requires administrative review of agency decisions. 43 U.S.C. § 1701(a)(5).

149.    In eliminating the 15-day administrative protest process for timber sale decisions and providing no automatic stay of implementation of full force and effect timber sale decisions, the BLM eliminated all meaningful administrative review, in violation of FLPMA. Therefore, the Administrative Protest Elimination Rule is facially invalid and *ultra vires*.

150.    Plaintiffs are entitled to their reasonable fees, costs, and expenses associated with this litigation pursuant to the EAJA. 28 U.S.C. § 2412.

## FOURTH CLAIM FOR RELIEF
**Violation of the Federal Land Policy and Management Act (42 U.S.C. § 1701(a)(5)) and
Violation of the Administrative Procedure Act (5 U.S.C. §§ 5 U.S.C. § 553(c)), 706(2)):
Mine your Manners Timber Sale Decision Record**

151.    Plaintiffs incorporate by reference all preceding paragraphs.

152.    FLPMA requires administrative review of agency decisions. 43 U.S.C. § 1701(a)(5).

153.    The BLM authorized the Mine your Manners Timber Sale without an administrative protest process.

154.    The APA requires that agencies provide a reasoned analysis for a change in policy

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 38 -

*Western Environmental Law Center*
*4107 NE Couch St.*
*Portland, OR 97232*
*(503) 914-1323*

position, without which an agency action is arbitrary, capricious, and not in accordance with law. 5 U.S.C. § 706(2).

155.   The BLM finalized the Administrative Protest Elimination Rule without providing a reasoned analysis for its change in position. The agency then relied on the Administrative Protest Elimination Rule to proceed with the Mine your Manners Timber Sale without an administrative protest process.

156.   Under the APA, an agency undertaking a notice-and-comment rulemaking is required to consider and respond to significant public comments. 5 U.S.C. § 553(c).

157.   The BLM failed to respond to numerous significant substantive public comments during the Administrative Protest Elimination Rule notice-and-comment rulemaking. The BLM then finalized the Administrative Protest Elimination Rule and relied on it to authorize the Mine your Manners Timber Sale without an administrative protest process.

158.   The BLM's decision to proceed with Mine your Manners Timber Sale without an administrative protest process and in reliance on the Administrative Protest Elimination Rule is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, in violation of FLPMA and the APA, 5 U.S.C. § 706(2).

159.   Plaintiffs are entitled to their reasonable fees, costs, and expenses associated with this litigation pursuant to the EAJA. 28 U.S.C. § 2412.

## PRAYER FOR RELIEF

THEREFORE, Plaintiffs respectfully request that the Court:

1.   Enter a declaratory judgment that the Final Administrative Protest Elimination Rule violates FLPMA's administrative review requirements and is arbitrary and capricious under the APA;

COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 39 -

*Western Environmental Law Center*
*4107 NE Couch St.*
*Portland, OR 97232*
*(503) 914-1323*

2.      Hold unlawful and vacate the Final Administrative Protest Elimination Rule, reinstating the 1984 regulations in place prior to the enactment of the Final Administrative Protest Elimination Rule;

3.      Enjoin federal defendants from implementing, enforcing, or relying upon the Final Administrative Protest Elimination Rule, including the full force and effect provision;

4.      Enjoin the BLM from conducting the Mine your Manners Timber Sale without an administrative protest process;

5.      Grant Plaintiffs such further and additional relief as the Court may deem just and proper; and

6.      Award Plaintiffs their reasonable fees, costs, and expenses, including attorney's fees associated with this litigation.


DATED this 12th day of October, 2021.


                              Respectfully submitted,

                              _____
                              SUSAN JANE M. BROWN (OSB #054607)
                              WESTERN ENVIRONMENTAL LAW CENTER
                              4107 NE Couch St.
                              Portland, OR 97232
                              (503) 914-1323
                              brown@westernlaw.org

                              *Attorney for Plaintiffs*


COMPLAINT FOR DECLARATORY
AND INJUNCTIVE RELIEF - 40 -