IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

CASCADIA WILDLANDS,
KLAMATH-SISKIYOU WILDLANDS
CENTER, and OREGON WILD,                                    Case No. 6:21-cv-01487-MC

        Plaintiffs,                                    **OPINION & ORDER**

    v.

BUREAU OF LAND MANAGEMENT
and UNITED STATES DEPARTMENT
OF THE INTERIOR,

        Defendants,

    and

DOUGLAS COUNTY, OREGON and
AMERICAN FOREST RESOURCE COUNCIL,

        Intervenor-Defendants.
_____

**MCSHANE, Judge**:

        Plaintiffs are Cascadia Wildlands, Klamath-Siskiyou Wildlands Center, and Oregon

Wild. They bring this action for declaratory and injunctive relief against Defendants Bureau of

Land Management and the U.S. Department of the Interior (collectively, "BLM"), alleging that

BLM's Final Rule[1] violates both the Administrative Procedure Act ("APA") and the Federal

Land Policy and Management Act ("FLPMA"). Compl., ECF No. 1. Plaintiffs further allege that,

in relying on the Final Rule, BLM improperly authorized the Mine your Manners Timber Sale in

violation of the APA and FLPMA.

_____

[1] Forest Management Decision Protest Process and Timber Sale Administration, 85 Fed. Reg. 82,359 (Dec. 18, 2020).

Plaintiffs seek vacatur of the Final Rule, and enjoinment of the Mine your Manners Timber Sale. Plaintiffs, BLM, and Intervenor-Defendants (American Forest Resource Council ("AFRC") and Douglas County) filed Cross-Motions for Summary Judgment on the claims in this case. ECF Nos. 28, 33, 34. Because the Final Rule does not violate the APA or FLPMA, Plaintiffs' Motion for Summary Judgment (ECF No. 28) is DENIED and Defendants' Cross-Motions for Summary Judgment (ECF Nos. 33, 34) are GRANTED.

## BACKGROUND

Congress enacted the FLPMA in 1976, giving BLM (through the Secretary of the Interior) authority to manage certain federal public lands. Federal Land Policy and Management Act of 1976, 43 U.S.C. §§ 1701–1787; *Gardner v. U.S. BLM*, 638 F.3d 1217, 1220 (9th Cir. 2011). Under the FLPMA, Congress declared it the policy of the United States that, among other things, public lands be managed "on the basis of multiple use and sustained yield," and in a manner that will protect the quality of scientific, ecological, and environmental values. 43 U.S.C. § 1701(a)(7)–(8). "[I]n administering public land statutes and exercising discretionary authority granted by them," BLM must "establish comprehensive rules and regulations" and "structure adjudication procedures to assure adequate third party participation, objective administrative review of initial decisions, and expeditious decisionmaking." *Id.* § 1701(a)(5).

In 1984, BLM enacted a regulation that provided a 15-day administrative protest process for forest management decisions, including advertised timber sales. Forest Management Decisions; Administrative Remedies, 49 Fed. Reg. 28,560 (July 13, 1984) (to be codified at 43 C.F.R. pt. 5000); 43 C.F.R. § 5003.3 (1984) ("1984 Rule"). The 1984 Rule was enacted to "expedite implementation of decisions relating to forest management," "provide the public with the opportunity to protest such decisions," and "increase the probability that private businesses

dependent upon the [BLM's] timber management contracts would be able to accomplish their

regularly scheduled activities." Administration of Forest Management Decisions; Proposed

Rulemaking, 49 Fed. Reg. 3,884 (proposed Jan. 31, 1984) (to be codified at 43 C.F.R. pt. 5000);

Forest Management Decisions; Administrative Remedies, 49 Fed. Reg. at 28,560. Under the

1984 Rule, interested members of the public could file an administrative protest within 15 days

of the publication of a notice of timber sale decision. 43 C.F.R. § 5003.3(a) (1984). The

authorized officer was then required to consider each individual protest and serve a conclusion in

writing. *Id.* § 5003.3(d)–(e). The regulations do not establish a timeframe for rendering a

decision on protests. *See* AR 000008.[2]

 Denial of a protest triggered a 30-day administrative appeal period, allowing the protester

to file a notice of appeal with the Interior's Board of Land Appeals ("IBLA"). 43 C.F.R. § 4.21.

Along with the notice of appeal, the appellant could include a request for stay of the sale

decision. *Id.* § 4.21(b). Generally, a sale decision would not become effective during the 30-day

appeal period. *Id.* § 4.21(a)(1). However, the IBLA could provide that a decision "shall be in full

force and effective immediately" when the public interest requires. *Id.*; *see also* 43 C.F.R. §

5003.3(f) (1984) ("Upon denial of a protest . . . the authorized officer may proceed with

implementation of the decision.").

 BLM enacted the Final Rule in 2020, which eliminated the 15-day protest process and

clarified that an authorizing officer can implement forest management decisions immediately.

Forest Management Decision Protest Process and Timber Sale Administration, 85 Fed. Reg.

82,359 (Dec. 18, 2020); AR 001009–25. BLM reasoned that the Final Rule will "facilitate

expeditious development and implementation of forest management decisions while encouraging

---

[2] Citations to "AR" refer the Forestry Rulemaking Administrative Record. Citations to "MYM" refer to the Mine your Manners Timber Sale Administrative Record.

the BLM to consider relevant information earlier in its decision-making process." AR 001010.

The public maintains the ability to appeal timber sale decisions to the IBLA, but a notice of

appeal or request for stay does not automatically stay the decision. AR 001011.

Plaintiffs argue that BLM violated the APA by failing to provide a reasoned explanation

for its change in policy and failing to respond to public comment. They further contend that the

Final Rule violates the FLPMA because it does not provide for adequate public participation or

objective administrative review of agency decisions. BLM responds that it complied with its

obligations under the APA and the Final Rule satisfies the FLPMA's requirements.

## **LEGAL STANDARD**

Judicial review of agency action is governed by the APA. 5 U.S.C. § 706. A reviewing

court may set aside an agency's action if the action is "arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). "If an agency fails to

consider an important aspect of a problem or offers an explanation for the decision that is

contrary to the evidence, its action is arbitrary and capricious." *Or. Nat. Res. Council Fund v.*

*Goodman*, 505 F.3d 884, 889 (9th Cir. 2007) (cleaned up). "An agency action is also arbitrary

and capricious if the agency fails to 'articulate a satisfactory explanation for its action including

a "rational connection between the facts found and the choice made."'" *Friends of Wild Swan,*

*Inc. v. U.S. Fish & Wildlife Serv.*, 12 F. Supp. 2d 1121, 1131 (D. Or. 1997) (quoting *Motor*

*Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).

When reviewing an agency action under the arbitrary and capricious standard, the court

must consider whether the agency's decision was "based on a consideration of the relevant

factors and whether there has been a clear error of judgment." *Citizens to Pres. Overton Park,*

*Inc. v. Volpe*, 401 U.S. 402, 416 (1971). While the court's "inquiry into the facts is to be

searching and careful, the ultimate standard of review is a narrow one. The court is not

empowered to substitute its judgment for that of the agency." *Id.* That said, the court may not

simply "rubber-stamp the agency decision as correct." *N. Spotted Owl (Strix Occidentalis*

*Caurina) v. Hodel*, 716 F. Supp. 479, 482 (W.D. Wash. 1988).

Because this Court's review under the APA is generally limited to the administrative

record, no facts are in dispute.[3] However, the parties have filed a Motion and Cross-Motions for

Summary Judgment, which may be used as a vehicle for the Court to conduct its review of the

record. Therefore, the Court's role is "to determine whether or not as a matter of law the

evidence in the administrative record permitted the agency to make the decision it did."

*Occidental Eng'g Co. v. INS*, 753 F.2d 766, 769 (9th Cir. 1985).

## DISCUSSION

### I. Administrative Procedure Act

Plaintiffs argue that BLM violated the APA by (1) failing to provide a reasoned analysis

explaining its change in policy from the 1984 Rule to the Final Rule and (2) failing to adequately

respond to public comments during the rulemaking process. Pls.' Mot. Summ. J. 15, 25, ECF No.

28.

#### A. BLM's Reasoned Analysis for the Final Rule

"Agencies are free to change their existing policies as long as they provide a reasoned

explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016); *see*

*also State Farm*, 463 U.S. at 42. To meet the "reasoned analysis" requirement, an agency must

---

[3] In their cross-motions for summary judgment, BLM and Intervenor-Defendants moved to strike three declarations
Plaintiffs submitted with their motion for summary judgment. BLM's Cross-Mot. Summ. J. 27, ECF No. 34;
Intervenor-Defs.' Cross-Mot. Summ. J. 17, ECF No. 33. The Court granted the motions to strike as stated on the
record from the oral argument hearing held on February 1, 2023. In sum, Plaintiffs purported to offer their
declarations for purposes of establishing standing, but standing is not at issue in this case. Further, the majority of
the statements from Plaintiffs' declarations are already in the administrative record from Plaintiffs' comment letter
to BLM during the rulemaking process. *See* Pls.' Reply ISO Mot. Summ. J. 29–32, ECF No. 35; AR 00656–75.

show (1) an awareness of its change in position, (2) "that the new policy is permissible under the statute," (3) a belief that the new policy is better than the old, and (4) that there exist good reasons for the new policy. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). "In explaining its changed position, an agency must also be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account.'" *Encino*, 579 U.S. at 221–22 (quoting *Fox*, 556 U.S. at 515). In such cases, a "reasoned explanation is needed for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Fox*, 556 U.S. at 515–16. Overall, a court should "uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Fox*, 556 U.S. at 513–14 (quoting *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974)).

### 1. Awareness of change in position

The first *Fox* factor requires that the agency "display awareness that it *is* changing position." *Fox*, 556 U.S. at 515. "An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *Id.* Throughout the text of the Final Rule, BLM expressly acknowledged that it is changing its previous regulations. In the initial summary, BLM declared that it is "amending its regulations governing protests of forest management decisions and administration of the timber sale process." AR 001009. BLM later stated that the Final Rule "eliminates the current administrative protest process after a forest management decision is issued. This change will facilitate expeditious development and implementation of forest management decisions while encouraging the BLM to consider relevant information earlier in its decision-making process." AR 001010. BLM further explained that "[a]t least in some instances, the protest process added time and expense to the decision-making process, contrary to the express purpose of the 1984 [Rule]." *Id.*

The above statements are more than enough to demonstrate BLM's awareness that it was changing its position from the 1984 Rule. Plaintiffs argue that BLM did not satisfy the first *Fox* factor because, in eliminating the protest process, "BLM failed to publicly disclose and acknowledge that [the process] was a major purpose of the 1984 [] Rule." Pls.' Mot. 17. Plaintiffs attempt to impose a heightened awareness standard on BLM with no support in case law. The Supreme Court in *Fox* simply required that an agency show awareness that it is changing its policy, which BLM has done here.

### 2. Permissible under the statute

The second *Fox* factor requires the new policy to be permissible under the applicable statute, which is the FLPMA in this case. The validity of the Final Rule under the FLPMA is analyzed in greater detail in Section II below.

### 3. Belief that new policy is better

The third *Fox* factor requires that the agency believe its new policy is better than the old policy, "which the conscious change of course adequately indicates." *Fox*, 556 U.S. at 515. Plaintiffs argue that BLM did not meet this factor because it failed to address comments that the Final Rule was not a better policy than the status quo, and simply reasserted without support that other public participation opportunities exist making the protest process redundant. Pls.' Mot. 18.

BLM's responses to public comment are discussed in greater detail below. *See* Section I.B. The text of the Final Rule, however, demonstrates that BLM sufficiently responded to Plaintiffs' significant public comments. Regarding Plaintiffs' challenge to the adequacy of public involvement under the Final Rule, BLM determined that other processes, like the development of resource management plans, provided sufficient public participation opportunities to meet BLM's statutory obligations. AR 001012. BLM detailed those processes in the Final Rule and

opined that the best opportunity to influence the management of resources is during the early planning stages, before the formulation of a decision. AR 001011–12. BLM further explained that eliminating the protest process would expedite forest management decisions and effectuate BLM's obligations to conduct timber sales under the O&C Act, objectives that were often delayed by the protest process. AR 001010.

Like their argument under the first *Fox* factor, Plaintiffs attempt to impose a heightened standard on BLM unsupported by case law. BLM's "conscious change of course," in addition to its reasoning that the Final Rule meets statutory obligations and improves efficiency, is enough to demonstrate BLM's belief that the Final Rule is better policy than the 1984 Rule. *See Fox*, 556 U.S. at 515.

### 4.    Good reasons exist for new policy

The final *Fox* factor requires that there exist good reasons for the new policy. *Fox*, 556 U.S. at 515. An agency is entitled to reweigh competing policy concerns when changing its regulations, "even on precisely the same record." *See Organized Vill. of Kake v. U.S. Dep't of Agric.*, 795 F.3d 956, 968 (9th Cir. 2015). But "even when reversing a policy after an election, an agency may not simply discard prior factual findings without a reasoned explanation." *Id.* BLM asserts that it provided multiple good reasons to depart from the 1984 Rule: (1) the Final Rule encourages public involvement earlier in the decision-making process, allowing BLM to better respond to input; (2) the protest process delayed implementation of forest management decisions, including wildfire treatments and sales made to effectuate the BLM's obligations under the O&C Act; and (3) the Final Rule improves administrative efficiencies and frees up BLM staff to better manage public lands. BLM's Cross-Mot. Summ. J. 14, ECF No. 34; BLM's Reply ISO Mot. Summ. J. 9, ECF No. 37.

Plaintiffs argue that BLM failed to provide a rational connection between the facts BLM relied on and its decision to eliminate the protest process. Pls.' Mot. 19; *see State Farm*, 463 U.S. at 43 ("[An] agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'"). Specifically, Plaintiffs claim that BLM failed to produce evidence showing changes to its forest management planning since 1984, increased costs from responding to protests, and a lack of reduced appeals and litigation of agency decisions. Pls.' Mot. 19–20. Plaintiffs further allege that BLM simply parroted Intervenor-Defendant AFRC's allegations to support eliminating the protest process, which suggested that advocacy groups used the protest process to delay implementation and increase the cost of timber sales. *Id.* at 20–21. Finally, Plaintiffs argue that BLM failed to consider the reliance interests of its members when BLM changed its policy position. Pls.' Br. 24.[4]

The Court finds that BLM provided satisfactory reasons for the Final Rule and that those reasons are supported by the administrative record. Throughout the Final Rule's text, BLM refers to the added time and expense of the protest process on the implementation of forest management decisions. BLM cited its review of 1,560 timber sale decisions between 2002 and 2017, which revealed that 26% of the total volume of those sales were protested. AR 001010. The average time between advertisement and award of those protested sales was 251 days. *Id.* Though Plaintiffs offer a competing interpretation of the data, the record supports the numbers BLM cited to in the Final Rule. *See* Pls.' Mot. 21–22; AR 000101. Indeed, the data shows that

---

[4] Plaintiffs cite *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) to support this argument, but Plaintiffs have not established reliance interests like those implicated in *Regents* which demanded more serious consideration from the agency. Further, as explained in this section, the Court is convinced that BLM provided a reasoned explanation for its change in policy which adequately accounted for Plaintiffs' purported reliance interests.

the average time between advertisement and approval of an unprotested timber sale is 34 days, in stark contrast to the 251 average days for a protested sale. AR 000101. The data further reveals that 72% of protested sales were eventually approved, 44% of protested sales where then appealed to the IBLA, and 79% of appealed sales were approved for contracts. AR 000101–02.

BLM went on to determine that the protest process delayed implementation of wildfire mitigation treatments and hindered BLM's ability to meet its timber sale obligations under the O&C Act. AR 001011, 001013. BLM further determined that the protest process was "largely duplicative of other opportunities for public involvement," including through processes afforded by the National Environmental Policy Act ("NEPA"). AR 001010. BLM concluded that the protest process did not achieve one of its original purposes, to expedite the timber sale process, and BLM therefore decided to remove the process. AR 001012.

BLM's desire to streamline its forest management process so that it can effectuate decisions pertaining to wildfire risk and meet its timber sale obligations under the O&C Act is a legitimate reason for changing its policy, and the Final Rule eliminating the protest process is rationally connected to that reason. BLM also sought to involve the public at the earlier planning stages of forest management decisions to better inform the agency in its decision-making and avoid a long, duplicative process after the decision had been made, which is also rationally connected to eliminating the protest process. Plaintiffs contend that the Final Rule does not promote decreasing wildfire risk, as BLM has conducted an increased number of regeneration harvest timber sales which in turn make forests less fire-resistant. Pls.' Reply ISO Mot. Summ. J. 9–11, ECF No. 35. But Plaintiffs cannot refute BLM's reasoning and supporting data that shows the protest process often delayed timber sale decisions which BLM is authorized, and in some

cases obligated, to make. Overall, Plaintiffs disagree with BLM's reasons for changing course, but they have not shown them to be legally insufficient.

### B. BLM's Responses to Public Comment

Under the APA, an agency must consider and respond to significant public comments during the notice-and-comment rulemaking process. 5 U.S.C. § 553(c); *Am. Mining Congress v. U.S. EPA*, 965 F.2d 759, 771 (9th Cir. 1992). Significant comments are "those which raise relevant points and which, if adopted, would require a change in the agency's proposed rule." *Am. Mining*, 965 F.2d at 771. "The failure to respond to comments is grounds for reversal only if it reveals that the agency's decision was not based on consideration of the relevant factors." *Id.*

Plaintiffs allege that BLM failed to respond to the following public comments: (1) that the Final Rule renders the IBLA appeal process illusory and violates the APA and FLPMA; (2) regarding the public policy benefits of having a fair and transparent administrative review process; (3) that the definition of "forest management activity" should not be altered because the new definition would make administrative review of individual decisions more difficult; (4) that the U.S. Forest Service's administrative review processes could better serve the BLM's goals of decreasing controversy and litigation; (5) regarding the veracity of the BLM's purported link between the protest process and an increase in wildfire risk; (6) that the scope of the Final Rule is fatally vague and seeking clarification on whether the rule will apply to lands managed by the Forest Service; (7) that the Final Rule will result in increased litigation and expenses on all parties; and (8) seeking clarification on whether an IBLA appeal would be required for parties to exhaust their administrative remedies. *See* Compl. ⁋ 96; Pls.' Mot. 25–31; AR 000656–74.

Plaintiffs' first three comments pertain to administrative review of agency decisions and public participation in the decision-making process. BLM first addressed comments that

removing the protest process and automatic stay does not allow for effective administrative review and may result in increased litigation in federal district court. AR 001011. BLM explained that it found the protest process duplicative of the NEPA and IBLA processes that allow for public participation and administrative review. *Id.* BLM further explained that the public maintains the ability to administratively appeal to the IBLA, the IBLA may issue a stay pending appeal where appropriate, and the public can continue to challenge forest management decisions in federal court. *Id.*

BLM next addressed comments that the Final Rule is arbitrary and capricious under the APA because BLM failed to adequately explain its reasons for the policy change and that the Final Rule violates the FLPMA's requirements for public participation. AR 001012. BLM responded that the FLMPA gives BLM broad discretion to identify appropriate public participation procedures when promulgating public land management rules. *Id.* BLM contended that the FLPMA "does not require public participation for every BLM implementation decision." *Id.* BLM explained that timber sale decisions often begin with developing a Resource Management Plan, which allows the public to submit comment on issues that BLM should consider in the plan. *Id.* BLM also drafts Environmental Impact Statements as part of the NEPA process, which include a public comment period. *Id.* BLM continued to detail various other public participation opportunities through the course of the decision-making process, then reiterated that the Final Rule does not alter these processes. *Id.* The Court finds that BLM adequately responded to Plaintiffs' comments concerning administrative review and public participation.

In response to Plaintiffs' request that BLM consider a pre-decisional process similar to that used by the U.S. Forest Service in order to achieve better public participation, BLM stated

that "public participation can otherwise be integrated into the BLM's decision-making process" as explained above and "that an additional comment period would be redundant and unlikely to raise new issues or lead to different outcomes." AR 001013. As to Plaintiffs' wildfire comment, BLM explained that eliminating the protest process will help reduce delays of BLM's implementation decisions, some of which are made to mitigate the effects of wildfire. AR 001013. Plaintiffs hotly contest BLM's increased use of regeneration harvesting, which is shown to increase wildfire risk. AR 000668–70. BLM stated that it received comments suggesting that the Final Rule "would affect resources such as water quality, wildlife habitat, carbon storage, potential wildfire behavior, older trees, and other resources due to an increase in logging." AR 001015. BLM responded that the Final Rule "addresses the BLM's administrative procedures for forest management decisions. It does not authorize any on-the-ground actions or constrain the BLM's substantive decision-making discretion with respect to harvest methods or the amount of timber harvest that will occur on public lands." *Id.* BLM confirmed that such "planning and forest resource decisions are made through a separate decision-making process and must comply with NEPA as appropriate." *Id.*

The remaining comments that BLM arguably failed to respond to were not significant comments. They include the application of the Final Rule to U.S. Forest Service lands, increased litigation and expenses under the Final Rule, and the exhaustion of administrative remedies under the Final Rule.

The Final Rule includes little mention of litigation and costs. In its discussion of the protest process, BLM found that the process "did not avert administrative appeals and judicial litigation as evidenced by the numerous appeals and multiple lawsuits since 1984." AR 001010. BLM does not cite to any data confirming this contention. Regardless, Plaintiffs' comment that

the Final Rule may cause increased litigation and expenses is not one that would require BLM to change the Final Rule, and BLM therefore was not obligated to respond to it. *See Am. Mining*, 965 F.2d at 771. Similarly, Plaintiffs' comments seeking clarification about exhaustion of administrative remedies and whether the Final Rule applies to U.S. Forest Service lands were not significant comments that would have required BLM to change the Final Rule.

The Court finds that BLM adequately responded to Plaintiffs' significant public comments in accordance with the APA.

## II. Federal Land Policy and Management Act

Section 1701(a) of the FLPMA establishes several policies of Congress related to the management of public lands, one of which calls for BLM "to structure adjudication procedures to assure adequate third party participation, objective administrative review of initial decisions, and expeditious decisionmaking." 43 U.S.C. § 1701(a)(5). The policies in § 1701(a) are followed by this statement:

> The policies of this Act shall become effective only as specific statutory authority for their implementation is enacted by this Act or by subsequent legislation and shall then be construed as supplemental to and not in derogation of the purposes for which public lands are administered under other provisions of law.

43 U.S.C. § 1701(b). Plaintiffs argue the Final Rule does not provide adequate third-party participation or objective administrative review of initial decisions as required by § 1701(a)(5), which Plaintiffs claim imposes mandatory obligations on BLM.[5] Pls.' Reply 25–26, n.14. BLM responds that § 1701(a)(5) is an unenforceable policy declaration, citing § 1701(b) and case law stating that "broad statutory mandates are unenforceable" under the APA. BLM's Mot. 24;

---

[5] Plaintiffs cite a district court case stating that this "language of Congress is mandatory" to support their argument. Pls.' Reply 26, n.14 (quoting *Mountain State Legal Found. v. Andrus*, 499 F. Supp. 383, 395 (D. Wyo. 1980)). However, Plaintiffs failed to note that the quoted language immediately follows a different provision of the FLPMA. Additionally, *Andrus* dealt with the federal defendants' total lack of rules and regulations for the processing of oil and gas lease applications, which is not the situation here.

BLM's Reply 7–8 (citing *Stout v. U.S. Forest Serv.*, 869 F. Supp. 2d 1271, 1279 (D. Or. 2012)).

Ninth Circuit case law does not resolve the threshold issue presented here of whether § 1701(a)(5) imposes specific, mandatory obligations on BLM. In *Perkins v. Bergland*, 608 F.2d 803, 805 (9th Cir. 1979), the court interpreted a FLPMA provision, 43 U.S.C. § 1752(e), that emphasized the Secretary of the Interior's discretion in determining grazing capacity. The court noted that if it were confronted with § 1752(e) alone, it "would have to consider the government's argument that the Secretary's discretion is so broad in determining grazing capacity . . . as to preclude all judicial review" of the Secretary's determination. *Id.* But the court then offered a provision from § 1701(a) which declares the policy that "judicial review of public land adjudication decisions be provided by law." *Id.* (quoting 43 U.S.C. § 1701(a)(6)). The court reasoned that § 1701(a)(6)'s policy declaration "removes any doubt Congress might otherwise have allowed to obscure the reviewability of grazing reduction decisions." *Id.* at 805–06. The court further explained, "[w]e do not understand by [§ 1701(b)] that Congress intended the courts to ignore the policy expressly favoring judicial review." *Id.* at 805 n.6.

Based on the language of § 1701(a)(5), (b), and *Perkins*, the Court interprets § 1701(a)(5) as establishing broad policy directives, which can prove useful in interpreting agency regulations and implementing provisions of the FLPMA, but which do not alone impose specific, mandatory obligations on BLM. However, as the Ninth Circuit explained in *Perkins*, the Court is not inclined to flatly disregard § 1701(a)(5)'s policy expressly favoring adjudication procedures that provide adequate public participation opportunities and objective administrative review of initial decisions. Further, another provision of the FLPMA requires BLM to establish procedures that give the public "an opportunity to participate in [] the preparation and execution of plans and programs for, and the management of, the public lands." 43 U.S.C. § 1739(e). With that in mind,

the Court considers Plaintiffs' argument that by eliminating the protest process and automatic stay, BLM's regulations no longer provide for adequate public participation and administrative review of forest management decisions under the FLPMA. Pls.' Mot. 31–32.

In response, BLM claims that the protest process is duplicative of other opportunities for public participation that satisfy the FLPMA's requirements, and that the IBLA appeal process provides objective administrative review of BLM's decisions.[6] BLM's Mot. 22–25.

## A. Public Participation

BLM claims that a patchwork of regulations provides adequate public participation opportunities for its forest management decisions, mainly through the NEPA process. BLM's Reply 4–5. NEPA requires agencies to complete an Environmental Impact Statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). If the significance of the effects of a proposed action is unknown, the agency instead prepares an Environmental Assessment ("EA") to determine the effects of the proposed action. 40 C.F.R. § 1501.5(a);[7] 43 C.F.R. § 46.300. If an EA reveals that the proposed action will not have significant environmental effects, the agency prepares a Finding of No Significant Impact ("FONSI"). 40 C.F.R. § 1501.6(a). Finally, agencies must establish "categories of actions that normally do not have a significant effect" on the environment, known as categorical exclusions, which do not require preparation of an EIS or EA. 40 C.F.R. § 1501.4(a); 43 C.F.R. § 46.205.

---

[6] Intervenor-Defendants in a footnote assert that BLM's interpretation of its obligations under the FLPMA is entitled to deference under *Chevron U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984). Intervenor-Defs.' Mot. 26 n.20. Because none of the parties briefed this issue, the Court does not address it. A cursory review of the *Chevron* framework, however, supports the Court's conclusion on Plaintiffs' FLPMA claims.

[7] The parties each cite to different year versions of the Council on Environmental Quality's ("CEQ") regulations. Plaintiffs claim that the CEQ substantially revised its NEPA regulations in 2020. Pls.' Mot. 9. To fully consider Plaintiffs' argument, the Court refers to the CEQ's revised regulations.

BLM's NEPA Handbook emphasizes that public involvement is an important component of the NEPA process. *See* BLM NEPA Handbook 62.[8] For preparation of an EIS, BLM must publish a notice of intent and begin the scoping process for the proposed action, where BLM "solicits internal and external input on the issues, impacts, and potential alternatives that will be addressed in an EIS." *Id.* at 2, 38; *see also* 43 C.F.R. § 46.235. External scoping involves notification and opportunities for feedback from the public, and it is required for preparation of an EIS. *Id.* BLM must then solicit comments from the public after releasing a draft EIS and respond to those comments before finalizing the proposed action. 40 C.F.R. §§ 1503.1(a)(2)(v), 1503.4.

For preparation of an EA, external scoping and a public comment period is not required by regulation. 43 C.F.R. § 46.235; Handbook 39, 76. However, BLM "shall involve the public . . . to the extent practicable in preparing environmental assessments." 40 C.F.R. § 1501.5(e); *see also* 43 C.F.R. § 46.305(1) ("The bureau must, to the extent practicable, provide for public notification and public involvement when an environmental assessment is being prepared."). "[T]he methods for providing public notification and opportunities for public involvement are at the discretion of [BLM]." 43 C.F.R. § 46.305(a). Though these provisions provide BLM with discretion regarding the kind and amount of public involvement for EAs, BLM has interpreted the regulations as still demanding "some form of public involvement in the preparation of all EAs." BLM NEPA Handbook 76. Scoping and public comment are also not required for categorical exclusions or FONSIs. *See id.* at 17 (stating that BLM "*may* elect to involve the public (for example, through notification and scoping)" when a categorical exclusion is used). However, BLM must evaluate categorical exclusions for extraordinary circumstances, such as

---

[8] Available at https://www.blm.gov/sites/blm.gov/files/uploads/Media_Library_BLM_Policy_Handbook_h1790-1.pdf.

having significant impacts on public health, safety, or natural resources, in which case BLM must prepare an EA or EIS. *See* 40 C.F.R. § 1501.4; 43 C.F.R. § 46.215; BLM NEPA Handbook 19. Additionally, a 30-day public review period is required for FONSIs where the proposed action is without precedent or similar to one that normally requires an EIS. 40 C.F.R. § 1501.6(a)(2); BLM NEPA Handbook 83.

Plaintiffs assert that, by eliminating the protest process, BLM no longer provides for adequate public participation opportunities for forest management decisions as required by the FLPMA. Pls.' Reply 22–26. Plaintiffs point to instances where BLM can omit scoping and public comment during the NEPA process, like when preparing an EA or using a categorical exclusion. *Id.* BLM concedes that in "limited instances [] BLM is not mandated by NEPA to provide public participation," but asserts that the "FLPMA does not require public participation for *every* BLM implementation decision, much less a particular kind of public participation." BLM's Reply 4–5. The Court agrees with BLM.

Plaintiffs' contention that the protest process is required to assure adequate public participation is simply not supported by the statutory framework. The FLPMA grants BLM discretion to structure its adjudication procedures in ways that provide adequate public participation opportunities in land management decisions. *See* 43 U.S.C. §§ 1701(a)(5), 1739(e). Nothing in the statute binds BLM to any specific procedure. BLM certainly could not do away with public involvement entirely, but that is not the case here. Rather, BLM determined that the NEPA process provides multiple public participation opportunities for forest management decisions that were duplicative of public participation through the protest process.[9] As detailed

---

[9] BLM also points to public participation opportunities during the Resource Management Plan ("RMP") development process. BLM's Reply 4. Approval of an RMP generally requires the preparation of an EIS, where BLM is required to involve the public in accordance with NEPA as explained above. *See* BLM NEPA Handbook 70; 43 C.F.R. § 1610.2(a).

above, when BLM prepares an EIS for proposed actions with significant environmental impacts, the public is afforded opportunities through early scoping and later review of the draft EIS to voice concerns and make suggestions on the proposed action. For those decisions in which the environmental impacts are unknown and BLM prepares an EA, BLM is still required to include the public "to the extent practicable." If the EA reveals significant environmental impacts, BLM must then go through the EIS process. Plaintiffs point to BLM's option to use categorical exclusions, where no public involvement is required, but those exclusions appear limited in scope.[10]

Ultimately, Plaintiffs take issue with BLM's new procedures for involving the public, but they cannot show that elimination of the protest process violates the FLPMA.

### B. Objective Administrative Review

BLM next asserts that the public maintains the ability to appeal forest management decisions to the IBLA under the Final Rule, which satisfies the FLPMA's requirements for objective administrative review. BLM's Mot. 24–25. The IBLA is a body of Administrative Judges within the Department of the Interior. 43 C.F.R. §§ 4.1(b), 4.2(a). The public may appeal BLM decisions relating to the use of public lands and their resources to the IBLA, which has the final word on Department appeals. *Id.* § 4.1(b)(2). Under the 1984 Rule, if a timber sale decision was protested, the decision was not implemented until BLM reviewed the protest. *See* Forest Management Decisions; Administrative Remedies, 49 Fed. Reg. at 28,562; 43 C.F.R. § 5003.3(d)–(f) (1984). The Final Rule eliminated the protest process, along with the effective stay of decision during BLM's review of the protest, and further clarified that filing an IBLA appeal

---

[10] Some examples of categorical exclusions include personnel actions and service contracts, internal organizational changes, routine financial transactions such as salaries and expenses, routine and continuing government business, hazardous fuels reduction activities, and post-fire rehabilitation activities. 43 C.F.R. § 46.210.

or request for stay does not automatically stay a decision. AR 001011–12. Plaintiffs argue that

BLM's elimination of the protest process and automatic stay renders forest management

decisions "final agency actions" with no meaningful administrative review. Pls.' Mot. 31–32.

Plaintiffs explain that "[w]hile an IBLA appeal still technically exists, when the timber sale

decision under appeal is accompanied by a full force and effect determination . . . the appeal does

not provide a stay of timber sale implementation, and therefore the IBLA appeal is illusory." *Id.*

at 32.

    The Court disagrees that a lack of automatic stay renders the IBLA's administrative

review meaningless. The Final Rule did not alter the public's ability to appeal BLM forest

management decisions to the IBLA and request a stay of the decision pending appeal. *See* AR

001011; 43 C.F.R. § 4.21. Appellants seeking a stay must file a petition along with their notice of

appeal. *Id.* § 4.21(b). The petition must demonstrate sufficient justification for a stay based on

the harm to the parties, likelihood of success on the merits, likelihood of irreparable harm, and

whether the public interest favors granting the stay. *Id.* The IBLA has 45 days from the

expiration of the 30-day appeal period to rule on a petition for stay. *Id.* § 4.21(b)(4). Even

without a stay, appellants have an opportunity to voice their concerns about a decision through a

statement of reasons for their appeal, which must be submitted to the IBLA within 30 days of

filing a notice of appeal. *See id.* § 4.412. Under current regulations, unaffected by the Final Rule,

the public is afforded an opportunity for objective administrative review of BLM's decisions

through the IBLA appeal process.

    Plaintiffs still maintain that without a stay of decision pending IBLA review, "the initial

timber sale decision is rendered immediately final when it is signed, and as such, there is no

longer 'an objective administrative review of *initial* decisions' as required by [§ 1701(a)(5) of

the] FLPMA." Pls.' Reply 26. Plaintiffs rely on *Darby v. Cisneros*, 509 U.S. 137 (1993), where

the Supreme Court evaluated the relationship between exhaustion of administrative remedies and

final agency action under the APA. The Supreme Court explained that, for purposes of judicial

review, an agency can avoid the finality of an initial decision by "adopting a rule that an agency

appeal be taken before judicial review" and "providing that the initial decision would be

'inoperative' pending appeal." *Id.* at 152. "Otherwise, the initial decision becomes final and the

aggrieved party is entitled to judicial review." *Id.*

Plaintiffs ask the Court to use *Darby*, an unrelated case about judicial review, to interpret

the word "initial" as it is used in § 1701(a)(5) as requiring an automatic stay of forest

management decisions pending administrative review. To do so would take *Darby* out of context

and impose an affirmative obligation on BLM that the FLPMA simply does not require. As the

Court previously explained, § 1701(a)(5) establishes broad policy directives which do not bind

BLM to any specific administrative review procedure. Rather, the statute gives BLM discretion

to structure its adjudication procedures to assure objective administrative review of initial

decisions. In distinguishing *Darby*, BLM explained that an agency decision being final for

purposes of judicial review does not mean that the IBLA does not provide administrative review

of the initial decision. BLM's Reply 6. The Court agrees. Other than their novel interpretation of

§ 1701(a)(5), Plaintiffs provide no authority to show that an automatic stay is required to achieve

objective administrative review of an initial agency decision under the FLPMA.[11]

---

[11] BLM also explains that from a practical standpoint, implementation of a timber sale decision does not occur
immediately after the timber sale decision is made. BLM's Reply 7 n.3. BLM must first auction the sale and execute
a contract with the highest bidder, who must then prepare to harvest. *Id.* Therefore, even for timber sale decisions
with no subsequent protest process or automatic stay pending IBLA review, there remains a period of time for IBLA
review prior to implementation of the decision. *Id.*

Further, the Court notes that under the old regulations, BLM always had the ability to implement forest management decisions while an IBLA appeal was pending. *See* Forest Management Decisions; Administrative Remedies, 49 Fed. Reg. at 28,561–62; 43 C.F.R. § 5003.1 (1984) ("The filing of a notice of appeal . . . shall not automatically suspend the effect of a decision governing or relating to forest management decisions."); 43 C.F.R. § 5003.3(f) (1984) ("Upon denial of a protest . . . the authorized officer may proceed with implementation of the decision."); 43 C.F.R. § 4.21(a)(1) (explaining that, "when the public interest requires," the IBLA may provide that a decision "shall be in full force and effective immediately" pending appeal).

For the reasons explained, the Court finds that the Final Rule does not violate the FLPMA.

### III. Mine your Manners Timber Sale

Plaintiffs contend that the Mine your Manners Timber Sale is invalid because BLM approved the sale operating under the Final Rule, which Plaintiffs assert is facially invalid. Pls.' Mot. 33. Plaintiffs state that BLM authorized the sale as a "full force and effect" decision with no protest process or automatic stay while the IBLA considered any requests for stay, thereby violating the APA and FLPMA requirements for public participation and administrative review. *Id.* BLM responds that it properly approved the sale under the Final Rule. BLM's Mot. 25. BLM explains that it offered a public comment period on its NEPA analysis for this sale, responded to those comments, and informed members of the public that they had 30 days for an "Administrative Remedy period." *Id.* at 26.

The Mine your Manners sale was part of the Row River Timber Management Project. MYM 00062–200. BLM began the Row River project by soliciting public comment through the

NEPA scoping process for the planning of an EA. MYM 00001–03, 00487. BLM then issued an EA and preliminary FONSI for the Row River project, which included analysis of the Mine your Manners sale, and provided a public comment period. *See* MYM 00062–00200, 00301–41, 00487. BLM responded to public comment letters on the Row River EA, then approved the Mine your Manners sale based on the analysis documented in the EA, the FONSI, and the associated project record. MYM 00486–95. BLM explained that a person adversely affected by the sale decision had 30 days to file a notice of appeal to the IBLA and could include a petition to stay implementation of the decision. MYM 00487–88. Plaintiffs submitted comments in response to the Row River project, but they did not appeal the Mine your Manners sale decision to the IBLA. *See* MYM 00012–55, 00492–95; BLM's Mot. 26.

Because the Final Rule does not violate the APA or FLPMA, Plaintiffs' challenge of the Mine your Manners sale necessarily fails. Further, the record demonstrates that BLM provided adequate public participation and administrative review opportunities for the sale.

## CONCLUSION

For the above reasons, the Court finds that the Final Rule does not violate the APA or FLPMA. Accordingly, Plaintiffs' Motion for Summary Judgment (ECF No. 28) is DENIED and Defendants' Cross-Motions for Summary Judgment (ECF Nos. 33, 34) are GRANTED.


IT IS SO ORDERED.

DATED this 27 day of March, 2023.

s/ Michael J. McShane
**Michael J. McShane**
**United States District Judge**